[No. D057493. Fourth Dist., Div. One. Mar. 8, 2011.]

F.T., Plaintiff and Appellant, v.
L.J., Defendant and Respondent.

2

6

---

**COUNSEL**

Sharron Voorhees for Plaintiff and Appellant.

Patrick L. McCrary for Defendant and Respondent.

OPINION

**McDONALD, J.**—F.T. (Father) appeals an order denying his motion to move with his son, J.J. (Child), to the State of Washington. On appeal, Father contends (1) he has a presumptive right to change Child's residence and L.J., Child's mother (Mother), did not carry her initial burden to show Child would suffer detriment were he to move with Father to Washington; (2) the trial court did not apply the proper legal standards in determining whether his move-away motion should be granted; and (3) Mother's criminal conviction for battering Child raises a rebuttable, if not conclusive, presumption that Mother should not have custody of Child.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2006, Child was born to Mother and Father, who had dated for five or six months. Child resided with Mother from his birth through February 17, 2007. On February 17, Mother burned Child's arm with a hot curling iron, apparently to teach him a lesson by showing him how hot it was. When Father picked up Child that evening, he observed Child's burn injury and took him to the hospital. A hospital employee apparently called child protective services (CPS) and the police. Based on the advice of a CPS worker and police, Father cared for Child in his residence and allowed Mother only supervised visits with Child.

On February 28, 2007, Father filed a petition to establish paternity of Child and for an order granting him sole legal and physical custody of Child. On March 2, Father filed an order to show cause requesting orders granting him sole legal and physical custody of Child and granting Mother only supervised visits with Child. The trial court ordered Mother and Father to attend custody mediation services and that Mother's visits with Child be supervised. Mother and Father met with Kevin Saluta, a Family Court Services (FCS) counselor, for mediation of custody and visitation issues, but they were unable to agree on a plan to share custody of Child. On April 3, FCS (Saluta) filed a report recommending that Father have legal custody of Child, that Child's primary residence be with Father, and that Mother have supervised visits with Child (based on substantiated allegations of Mother's abuse of Child). On April 11, Mother filed a response to Father's petition, admitting Father was Child's father and requesting an order granting her sole legal and physical custody of Child.

On April 23, 2007, Mother and Father stipulated that the FCS report's recommendations "be adopted as an order of the court without prejudice to either party." They further stipulated that Mother would pay Father $740 per month in child support. The court then adopted their stipulation as its order.

On September 14, 2007, Father filed an order to show cause (OSC) seeking an order allowing him to move with Child to Texas where Father had three children, an ex-wife and extended family, and would have job opportunities and a lower cost of living. Mother filed response papers opposing Father's request for a move-away order.

On September 18, 2007, a review hearing was held and the trial court modified its April 23 order and granted Mother unsupervised visits with Child and stated that all other orders were to remain in place.

On October 17, 2007, Mother and Father met with Diana Figueroa, an FCS counselor, for mediation of Father's move-away request, but they were unable to reach an agreement. On November 7, Figueroa, on behalf of FCS, filed a report stating she learned from the San Diego City Attorney's Office that on November 6 Mother pleaded guilty to one count of simple battery (Pen. Code, §§ 242, 243, subd. (a)) and apparently was granted four years' probation. Figueroa noted that Mother had an 11-year-old child from a previous relationship who resided with the paternal grandparents. Figueroa stated: "It is [her] opinion that [Child] should be allowed to move to Denton, Texas with [Father]. [Child] has been in [Father's] primary care since February 2007, after [Mother] physically abused [Child]. [Mother] recently plead[ed] guilty to battery in a case with the City Attorney related to the February 2007 incident." Figueroa further stated: "It is [her] opinion that [Child] is safe and stable in [Father's] care. It is not an option for [Child] to return to [Mother's] care, as she only recently moved from supervised time with [Child] to unsupervised time. [¶] [Father] indicated that he has extended family in Texas as well as his three children from a previous relationship. It would be beneficial to [Child] to have the opportunity to form a relationship with his half-siblings." Figueroa recommended that Mother and Father have joint legal custody (with Father having the sole decisionmaking right), that Child's primary residence be with Father (i.e., supporting Father's move-away request), and that Mother have certain unsupervised visitation rights both before and after Child moves to Texas. While Child was still in San Diego, Father would have Child 90 percent of the time and Mother would have him 10 percent of the time. After Child's move to Texas, Father would have Child 97 percent of the time and Mother would have him 3 percent of the time.

On December 5, 2007, the scheduled hearing on Father's move-away OSC was taken off the court's calendar. On February 5, 2008, Father refiled his OSC, again requesting an order allowing him to move with Child to Texas. Mother filed papers opposing Father's move-away request. The trial court appointed an expert to conduct a psychological evaluation of Mother, Father, and Child.

On September 12, 2008, Yanon Volcani, Ph.D., a psychologist, issued a report based on his psychological assessments for Child's custody and visitation. However, he did not set forth detailed findings, explaining that fully sharing the sensitive data with the parties could potentially cause harm. Nevertheless, Volcani set forth his general findings:

*"[T]he findings point to possible detriment to [Child] if at this time he moves with [F]ather to Texas.* Several factors come into play. First, [Child] appears to have a positive attachment to both parents. Given his age and stage of development, the continuation and deepening of his bond necessitates frequent contact over a variety of contexts (e.g., feeding, bathing, playing, putting to bed, waking in the morning). Hence, if [Child] was to move with [Father] to Texas, his bond and relationship [with Mother] likely would be significantly disrupted and atrophy. Telephone, webcam, and other means of distance contact are not well suited for a child his age. Furthermore, given the nature of his attachment to [Father], as well as the need for an incrementally-based expansion of time with [Mother], who is currently pregnant, long-term visits would not be appropriate at this time. In addition, findings suggested that [Father] might have some difficulty in consistently and enthusiastically supporting [Child's] relationship with [Mother]. This could become particularly problematic if the parents live at a distance from each other. *Such factors are contraindicative of a move to Texas being in [Child's] best interest[s].*

"As to [Mother], her actions in burning [Child] reflected, at best, rash impulsivity, profound insensitivity, and severe misjudgment. However, the current data does not suggest broader abusive intent. Indeed, [Mother] would appear to have meaningfully learned from this ordeal, and has become a significantly more effective caregiver. Hence, I am recommending that [Child's] time with her be incrementally expanded." (Italics added.)

On September 18, 2008, the trial court adopted Volcani's parenting plan recommendations "as a temporary order" and "[w]ithout prejudice" to the parties, pending an evidentiary hearing. In so doing, the court found that "there is no permanent order" and therefore made findings based on the "best interest[s]" of Child. Furthermore, the court found that its order was *not* a final order under *Montenegro v. Diaz* (2001) 26 Cal.4th 249 [109 Cal.Rptr.2d 575, 27 P.3d 289] (*Montenegro*).

On November 13, 2009, after previous continuances of the evidentiary hearing on Father's move-away request, the trial court continued the matter until March 5, 2010, referred the parties to FCS for further mediation, and authorized Volcani to prepare a supplemental report by January 22 and deliver it to FCS five days before the scheduled mediation date. However,

Volcani did not complete his supplemental report by January 22. Furthermore, on January 29, rather than postpone mediation pending receipt of Volcani's report, Lynn Waldman, an FCS counselor, proceeded with mediation between the parties and then issued a report on February 10 after the parties did not reach an agreement. In that report, Waldman noted that Father was now requesting to move with Child to Centralia, Washington, because he was marrying C.B., who lives and has a salon business there. The report discussed the numerous assertions by Mother and Father regarding incidents involving Child and problems with Mother's visitations since the last FCS report.

Waldman spoke with a CPS worker who told her that Child had temper tantrums and other behavior issues at school in September 2009, but Father began taking Child for counseling and by the end of October 2009 Child's behavior at school had markedly improved. Waldman spoke with Lorraine Weiner, Child's counselor, who told her she had been counseling Child for the past five months regarding anger issues, but that she "does not know where [Child's] anger is coming from." Waldman also spoke with Volcani, who apparently told her he had not met with Mother and Father in the past two years and did not know how they were currently functioning.[1] Waldman reported that Volcani said Child had a strong attachment to Mother and her new husband and also had an attachment to Father. Volcani stated that Child's relationship with Mother and her new husband could be disrupted were Child to move away. Waldman recommended that Mother and Father have joint legal custody of Child and that Child not be allowed to move with Father to Washington. Nevertheless, Waldman stated that Father had been Child's primary caregiver and "it makes sense for him to remain in this role." Waldman explained some of the reasons for her recommendations, stating:

"[T]he distance created by the move will severely limit the contact [Mother] has with [Child] on a frequent and on-going basis. [Child] is still quite young and needs to spend time with [Mother] frequently in order to maintain their relationship. It seems [Child] should have the opportunity to address his relationship with [Mother] and to address the issues of abuse and [Child] only recently began counseling.

"Additionally, because the parents have great difficulty communicating, this counselor is concerned [Father] may not be supportive of [Child's] relationship with [Mother] and the distance created by the move will interfere

---

[1] That statement appears to conflict with Volcani's supplemental report, discussed below, stating that he had recently met on numerous occasions with Mother, Father, and Child. Also, as discussed below, Volcani concluded: "Since the original evaluation, [Mother] and [Father] seemed to have been co-parenting [Child] in a relatively cooperative and stable manner. [Father] directly noted during our meeting that, 'Things have been a lot better.' This sentiment was echoed by [Mother] when we met."

in [Child's] relationship with [Mother]. Dr. Volcani has also indicated [Father] does not seem conducive to co-parenting based on his testing results. Dr. Volcani indicated [Child] is bonded and attached to [Mother] and demonstrates a consistent emphasis on his relationship with her and the step-father and that it could be disruptive to [Child] to move.

"If the parents can learn to communicate more effectively and when [Child] is older, then a move away may seem more feasible to this counselor. [Child] would have more of an established relationship with [Mother] and the distance created by a move would not seem like such an obstacle in their relationship." Waldman concluded that Child's "primary residence shall be with [Father]" and proposed alternative shared parenting/visitation schedules depending on whether Child remained in San Diego with Father or moved to Washington with Father. If Child remained in San Diego, Father would have Child 80 percent of the time and Mother would have him 20 percent of the time. If Child moved with Father to Washington, Father would have Child 90 percent of the time and Mother would have him 10 percent of the time.

On February 22, one month after its due date, Volcani issued a supplemental report updating his original September 12, 2008, report. Volcani noted that Father now wanted to move with Child to Washington, instead of Texas, to join his wife, C.B., whom he had married on February 14, 2010. C.B. had a 13-year-old daughter and a seven-year-old daughter. Volcani met with Mother and her husband on November 16, 2009, and with Father on December 19. He also observed Child interact with Mother and her husband on December 8 and with Father on January 6, 2010. He met with Child on two occasions, Child being brought by Mother and her husband the first time and being brought by Father the second time. Volcani also met with C.B. Volcani administered various tests and used other methods to assess each of them. Volcani also spoke with Child's preschool teacher and his therapist. As noted above, Volcani found that: "Since the original evaluation, [Mother] and [Father] seemed to have been co-parenting [Child] in a relatively cooperative and stable manner. [Father] directly noted during our meeting that, 'Things have been a lot better.' This sentiment was echoed by [Mother] when we met." He noted that Child's preschool teacher told him that Child had anger issues and significant self-control problems two months before (e.g., throwing a chair and punching other children), but that he had since "gotten a whole lot better." Child's therapist confirmed Child's anger issues. However, because of Child's inability to readily verbalize his experiences, it was "difficult to know the derivatives of his rage." Regarding Child's attachments to his parents, Volcani found:

"Consistent with the initial evaluation, current findings pointed to [Child] having a strong attachment to both his parents, as well as his stepfather.

Indeed, he perceives all of them in a very positive manner as caretakers who attend to his needs. This seemed particularly the case in terms of [Mother]. For example, during the session in which he was brought by [Mother] and stepfather, I asked [him] whom he wanted me to include in a drawing of himself with his family . . . . [Child] had me first draw [Mother], and then him standing next to her. He next had me add a classmate . . . . Similarly, when shown a drawing of a home and asked whom he would want to live with him if he could have anyone, [Child] immediately stated, 'Mommy,' followed by [the classmate] and [Mother's] 13-year-old son from a prior relationship . . . .

"[Child] was administered the dependency scale of the Family Relations Test when brought by [Father]. The task includes picking figures to represent family members, and then indicating whom the child would pick to provide for his needs in various areas. . . . When asked whom he would want to cook his dinner and give it to him, [Child] replied [Mother], whom he also wanted to be the one to give him a bath. As to whom he would have help him if he was hurt, [Child] stated[:] '[Mother] and [stepfather].' . . . [Child] also would have '[stepfather] and [Mother]' be the ones to wake him up in the morning, help get him dressed, and make him breakfast. '[Mother] and [stepfather]' would be the ones to care for [Child] if he were sick, and to be with him if he were scared. . . . [¶] . . . [¶]

"The foregoing should *not* be interpreted as indicating a lack of attachment to [Father]. . . . [Child] did respond to the drawing of a colt in front of a barn marked 'Mom' and one marked 'Dad.' When asked to draw a line to the barn the colt would go to to be fed and sheltered, [Child] drew the line to the 'Dad' barn. Obviously many factors are involved in a minor's response profile, and unequivocal conclusions cannot be reached." Volcani concluded:

"[Child] is more able to sustain a secure bond with those most important to him while not being in their immediate presence on a weekly basis. However, frequency and consistency of contact would be imperative—whether [Child] moves with [Father] or remains in San Diego with [Mother] and stepfather. While the current findings indicate [Child] has a strong attachment to all three caregivers, at this point in some ways he appears to perceive [Mother] as his central caregiving figure.

". . . [F]inancial resources were not available to perform a complete clinical review of the parties. Thus, I do not have formal data as to each of their current psycho-emotional functioning and approach to parenting, nor of the change in familial factors with the birth of [Mother's baby]. Obviously, this would be highly relevant in terms of the ability of [Mother and stepfather] to be [Child's] primary caregivers, if [Father] moved to Washington and [Child] remained here.

"Furthermore, financial limitations also precluded a thorough investigation of the variables relevant to [Child] living in [Washington]. [C.B.] appears to be a well[-]functioning individual with good caregiving skills. She, furthermore, most likely would cooperate in co-parenting with [Mother and stepfather] . . . . In addition, . . . the familial environment that surrounds [C.B.] in [Washington] would seem potentially to be a marvelous context within which a young child could develop. . . . [Child] likely could form strong attachments to [C.B.], her daughters, and her extended family. Nonetheless, given the nature of his bond with [Mother and stepfather], there are potential liabilities in separating him from them at this time."

Volcani then stated: "I do not have sufficient data to make recommendations as to the central question of whether [Child] should move with [Father] or remain in San Diego in the care of [Mother] and stepfather." Nevertheless, regardless of whether Child moved with Father, Volcani recommended that Mother and Father have joint legal custody of Child.

On March 5, 2010, the trial court conducted an evidentiary hearing, apparently considering only documentary evidence and arguments of counsel.[2] The court denied Father's request to move with Child to Washington and directed Father's counsel to prepare a written order and submit it to Mother's counsel for approval. On May 6, the trial court issued its written order, finding:

"1. There is no disputing that [Father] is the primary caretaker of [Child].

"2. The standard to be applied in this case is the best interest[s] of the child.

"3. Page 3 of Dr. Volcani's report states that the parties seemed to be co-parenting in a relative[ly] cooperative and stable manner. This is the basis for the Court's decision as the Court sees this statement as a red flag that the parties are not communicating. Additionally, the events of May of 2009 and the bruise on [Child's] back, the child speaking out in his sleep, the pants wetting, [Child] physically acting out, and the numerous calls to CPS all point to a lack of meaningful dialog between the parents.

"4. Both [Child's] therapist and the child's day care teacher feel that [Child] is angry. The court feels that the anger is coming from the tension between the two parties.

"5. During the unguarded period of time with Dr. Volcani [Child] easily interact[ed] and show[ed] that he truly cares about all parties involved. He is

---

[2] The record does not contain a reporter's transcript from the March 5, 2010, hearing, and does not otherwise show that the testimony of any witnesses was presented at that hearing.

unrestrained in his ability to interact and build relationships and is working hard to maintain all of the relationships.

"6. The abuse to [Child] by [Mother] was clearly a huge event and it changed custody to [Father]. This event should have resulted in counseling immediately for [Child] and the Court is concerned because there is nothing showing as to why counseling was not started until recently.

"7. Based upon the foregoing facts, the Court finds that there is a probability of a likelihood of erosion of ties to [Mother] if the move is granted. The high level of lack of communication between the parties could undermine [Child's] development.

"8. If the move is granted[,] the impact of the relationship between [Child] and [M]other will be significant. The move will likely exacerbate the current problems rather than improve them. Father's reasons for the move, that is to join a new wife and family, are not sufficient and a new wife and family in Washington is not a sufficiently necessary reason to move the residence of [Child] to Washington with [Father].

"9. Nobody has informed the Court that [Father] absolutely will move even if the request is denied, so the court will not examine that question at this time and will assume that he is staying [in San Diego]. Should [Father] return ex parte and inform the court that he will move regardless, the court will then determine whether a change in custody . . . is in [Child's] best interest[s]."

The trial court "found that the move is not in the best interest[s] of [Child]" and therefore denied Father's request to move with Child to Washington. Father timely filed a notice of appeal.

## DISCUSSION

### I

*Standard of Review*

In general, "[t]he standard of appellate review of custody and visitation orders is the deferential abuse of discretion test." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*).) In an *initial* custody determination, a trial court, considering all of the circumstances, has the widest discretion to choose a parenting plan that is in the best interests of a child. (*Id.* at pp. 31–32; Fam. Code, § 3040,

subd. (b).[3]) In contrast, "[o]rdinarily, after a judicial custody determination, the noncustodial parent seeking to alter the order for legal and physical custody can do so only on a showing that there has been a substantial change of circumstances so affecting the minor child that modification is essential to the child's welfare." (*Burgess*, at p. 37, citing *Burchard v. Garay* (1986) 42 Cal.3d 531, 534 [229 Cal.Rptr. 800, 724 P.2d 486].) However, *Burgess* noted: "A different analysis may be required when parents *share* joint physical custody of the minor children under an existing order and in fact, and one parent seeks to relocate with the minor children. In such cases, the custody order 'may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest[s] of the child require[] modification or termination of the order.' (Fam. Code, § 3087.) The trial court must determine de novo what arrangement for primary custody is in the best interest[s] of the minor children." (*Burgess*, at p. 40, fn. 12.) "The changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest[s]. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements." (*Burchard*, at p. 535.)

Generally, a trial court abuses its discretion if there is no reasonable basis on which the court could conclude its decision advanced the best interests of the child. (*In re Marriage of Melville* (2004) 122 Cal.App.4th 601, 610 [18 Cal.Rptr.3d 685]; *Burgess, supra*, 13 Cal.4th at p. 32.) However, "all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." (*People v. Russel* (1968) 69 Cal.2d 187, 195 [70 Cal.Rptr. 210, 443 P.2d 794], superseded by statute on another ground as noted in *People v. Anderson* (2001) 25 Cal.4th 543, 575 [106 Cal.Rptr.2d 575, 22 P.3d 347]; see also *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 [60 Cal.Rptr.2d 93, 928 P.2d 1171].) Therefore, a discretionary decision may be reversed if improper criteria were applied or incorrect legal assumptions were made. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435–436 [97 Cal.Rptr.2d 179, 2 P.3d 27].) Alternatively stated, if a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law. (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8 [193 Cal.Rptr. 882, 667 P.2d 686]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496 [146 Cal.Rptr. 623, 579 P.2d 514] ["discretion can only be truly

---

[3] All further statutory references are to the Family Code unless otherwise specified.

exercised if there is no misconception by the trial court as to the legal basis for its action"]; *People v. Aubrey* (1998) 65 Cal.App.4th 279, 282 [76 Cal.Rptr.2d 378]; *People v. Marquez* (1983) 143 Cal.App.3d 797, 803 [192 Cal.Rptr. 193] ["an erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion"].) Therefore, a discretionary order based on the application of improper criteria or incorrect legal assumptions is *not* an exercise of *informed* discretion and is subject to reversal even though there may be substantial evidence to support that order. (*Linder*, at p. 436; *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655 [22 Cal.Rptr.2d 419].) If the record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit that court to exercise *informed* discretion with awareness of the full scope of its discretion and applicable law. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 257 [70 Cal.Rptr.2d 334, 949 P.2d 31]; *People v. Fuhrman* (1997) 16 Cal.4th 930, 944 [67 Cal.Rptr.2d 1, 941 P.2d 1189].) The appellant bears the burden of showing a trial court abused its discretion. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

██ In *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 [12 Cal.Rptr.3d 356, 88 P.3d 81] (*LaMusga*), the court addressed the standard that applies when a parent files a motion to modify a prior custody order because of a custodial parent's planned move with the child. In *LaMusga*, the trial court "ordered that primary physical custody of two minor children would be transferred from their mother to their father if their mother moved to Ohio." (*Id.* at p. 1078.) *LaMusga* concluded: "[J]ust as a custodial parent does not have to establish that a planned move is 'necessary,' neither does the noncustodial parent have to establish that a change of custody is 'essential' to prevent detriment to the children from the planned move. Rather, *the noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody. The likely impact of the proposed move on the noncustodial parent's relationship with the children is a relevant factor in determining whether the move would cause detriment to the children and, when considered in light of all of the relevant factors, may be sufficient to justify a change in custody. If the noncustodial parent makes such an initial showing of detriment, the court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the children.*" (*LaMusga*, at p. 1078, italics added.)

██ *LaMusga* stated the father "satisfied his initial burden of showing that the mother's planned move would cause detriment to the children, requiring a reevaluation of the children's custody." (*LaMusga, supra*, 32 Cal.4th at p. 1079.) In the circumstances of that case, it concluded the trial court "properly considered the relevant factors and did not abuse its discretion in

deciding that a change in primary custody from the mother to the father would be in the best interests of the children if the mother moves to Ohio." (*LaMusga*, at p. 1079.)[4] *LaMusga* stated: "We do not suggest that a showing that a proposed move will cause detriment to the relationship between the children and the noncustodial parent *mandates* a change in custody. But it is within the wide discretion of the superior court to order a change in custody based upon such detriment, if such a change is in the best interests of the children in light of all the relevant factors." (*LaMusga, supra*, 32 Cal.4th at p. 1095.) Regarding the initial showing of detriment, the court stated: "The mere fact that the custodial parent proposes to change the residence of the child does not automatically constitute 'changed circumstances' that require a reevaluation of an existing custody order. A proposed change in the residence of a child can run the gamut from a move across the street to a relocation to another continent. As we have noted, the noncustodial parent has the burden of showing that the planned move will cause detriment to the child in order for the court to reevaluate an existing custody order." (*LaMusga*, at p. 1096.) *LaMusga* then observed: "The likely consequences of a proposed change in the residence of a child, when considered in the light of all the relevant factors, may constitute a change of circumstances that warrants a change in custody, and the detriment to the child's relationship with the noncustodial parent that will be caused by the proposed move, when considered in light of all the relevant factors, may warrant denying a request to change the child's residence or changing custody. *The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances. We will generally leave it to the superior court to assess that impact in light of the other relevant factors in determining what is in the best interests of the child.*" (*Id.* at p. 1097, italics added.)

Regarding the custodial parent's reasons for a proposed move, *LaMusga* noted: "*Even if the custodial parent has legitimate reasons for the proposed change in the child's residence and is not acting simply to frustrate the noncustodial parent's contact with the child, the court still may consider whether one reason for the move is to lessen the child's contact with the noncustodial parent and whether that indicates, when considered in light of*

---

[4] *LaMusga* noted that although the trial court had previously awarded the mother " 'primary physical custody' " of the children, the Family Code does not use that term, but instead "uses the terms 'joint physical custody,' which 'means that each of the parents shall have significant periods of physical custody' (Fam. Code, § 3004), and 'sole physical custody,' which 'means that a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation' (Fam. Code, § 3007)." (*LaMusga, supra*, 32 Cal.4th at p. 1081, fn. 1.)

*all the relevant factors, that a change in custody would be in the child's best interests.*"[5] (*LaMusga, supra,* 32 Cal.4th at p. 1100, fn. omitted, italics added.)

■ *LaMusga* then set forth the factors that a trial court generally should consider in exercising its discretion whether to grant or deny a custodial parent's request to relocate with a minor child: "Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*LaMusga, supra,* 32 Cal.4th at p. 1101.)

Based on the record in *LaMusga,* the California Supreme Court concluded the trial court properly considered those factors and therefore did not abuse its discretion by transferring custody of the children to the father if the mother moved to Ohio. (*LaMusga, supra,* 32 Cal.4th at p. 1101.)

II

*Presumptive Right to Change Child's Residence*

Father contends the trial court erred by applying the best interests test without recognizing his presumptive right to change Child's residence pursuant to section 7501.

A

■ Section 7501, subdivision (a), provides: "A parent entitled to the custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child." Following *Burgess,* the Legislature enacted section 7501, subdivision (b), expressly stating it intended to affirm the California

---

[5] One court subsequently stated: "When parents share joint custody[,] the trial court need not question the wisdom of a parent's move or examine the reasons for the proposed move, but should certainly consider evidence of bad faith by the moving party if such exists. [Citations.]" (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364 [50 Cal.Rptr.3d 398].)

Supreme Court's decision in *Burgess* and declare that decision to be the public policy and law of California. (Stats. 2003, ch. 674, § 1.) *Burgess* stated that when a custodial parent seeks to relocate with a child and there is an *existing judicial custody determination*, the noncustodial parent has the burden of persuasion to show a substantial change of circumstances so affecting the child that a change in custody to the noncustodial parent is in the child's best interests if the custodial parent moves away. (*Burgess, supra*, 13 Cal.4th at pp. 37–38.) *Burgess* referred to a custodial parent's right under section 7501 to change a child's residence as a *presumptive* right that may be rebutted by a showing that the move is detrimental to the child. (*Burgess*, at p. 35; *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 957 [38 Cal.Rptr.3d 610, 127 P.3d 28].)

However, absent an existing judicial custody determination, the section 7501 rebuttable presumption does not apply. (*Burgess, supra*, 13 Cal.4th at pp. 37–38.) A custody order based on a stipulation of the parties does not constitute a final, existing judicial custody determination unless "there is a clear, affirmative indication the parties intended such a result." (*Montenegro, supra*, 26 Cal.4th at p. 258.)

B

Based on our review of the record on appeal, we have not found any final judicial custody determination that existed at the time of the hearing on Father's request to move with Child to Washington. The April 23, 2007, stipulation by Mother and Father that the FCS report's recommendations "be adopted as an order of the court without prejudice to either party," which was then adopted by the trial court, did *not* constitute a final judicial custody determination within the meaning of *Montenegro*, *Burgess*, and section 7501. Neither the stipulation nor the order included any clear language affirmatively showing it was the intent of Mother and Father that the order adopting their stipulation constitute a final judicial custody determination. (*Montenegro, supra*, 26 Cal.4th at pp. 257–258.) Nowhere in the stipulation or order do the words "final," "permanent," or "judgment," or words to that effect, appear. On the contrary, by using the qualifying language "without prejudice to either party," the stipulation appeared to express the parties' intent that the stipulated order be only temporary and subject to change and *not* be deemed a final judicial custody determination. (*Ibid.*) Father does not cite any other court order that could reasonably be interpreted as a final judicial custody determination. We reject Father's assertion that the trial court erred by not applying the section 7501 rebuttable presumption requiring Mother to show

Child would be detrimentally affected by a move with Father to Washington.[6] (*Montenegro, supra*, 26 Cal.4th at p. 256; *Burgess, supra*, 13 Cal.4th at p. 37; *In re Marriage of Richardson* (2002) 102 Cal.App.4th 941, 952 [126 Cal.Rptr.2d 45].)

Because we conclude there was no existing final judicial custody determination at the time of the move-away hearing, neither the section 7501 rebuttable presumption nor any other requirement that Mother show changed circumstances (e.g., detriment to Child) since the initial custody determination applied. Therefore, Mother did not have an initial burden to show Child would suffer detriment were he to move with Father to Washington.

## III

*Trial Court's Misunderstanding of Proper Legal Standards*

Father contends the trial court abused its discretion by denying his move-away motion because it misunderstood the proper legal standards to be applied in determining whether that motion should be granted.

## A

In an *initial* custody determination, a trial court, considering all of the circumstances, has the widest discretion to choose a parenting plan that is in the best interests of a child. (*Burgess, supra*, 13 Cal.4th at pp. 31–32; § 3040, subd. (b).) In making a determination of the best interests of a child, a trial court should consider various factors, including the health, safety, and welfare of the child (§ 3011, subd. (a)); the nature and amount of contact with both parents (§ 3011, subd. (c)); and which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent (§ 3040, subd. (a)(1)). In particular, regarding move-away cases, *LaMusga* stated: "Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the

---

[6] Assuming arguendo there was an existing final judicial custody determination at the time of the move-away hearing, we nevertheless would conclude Mother met her initial burden of showing Child would suffer detriment from the move by adversely affecting his relationship with Mother. Therefore, the section 7501 presumption would nevertheless have been rebutted, requiring the trial court to apply the best interests standard in determining Father's move-away request.

interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*LaMusga, supra*, 32 Cal.4th at p. 1101.) In general, the trial court shall consider "the effects of relocation on the 'best interest[s]' of the minor children." (*Burgess, supra*, 13 Cal.4th at p. 34.)

A custodial parent seeking to relocate with a child does not have any burden to show the proposed move is "necessary." (*Burgess, supra*, 13 Cal.4th at pp. 28–29, 34; *LaMusga, supra*, 32 Cal.4th at p. 1088.) Nevertheless, "[e]ven if the custodial parent has legitimate reasons for the proposed change in the child's residence and is not acting simply to frustrate the noncustodial parent's contact with the child, the court still may consider whether one reason for the move is to lessen the child's contact with the noncustodial parent and whether that indicates, when considered in light of all the relevant factors, that a change in custody would be in the child's best interests." (*LaMusga*, at p. 1100, fn. omitted.)

*LaMusga* further observed: "The likely consequences of a proposed change in the residence of a child, when considered in the light of all the relevant factors, may constitute a change of circumstances that warrants a change in custody, and the detriment to the child's relationship with the noncustodial parent that will be caused by the proposed move, when considered in light of all the relevant factors, may warrant denying a request to change the child's residence or changing custody. The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances. We will generally leave it to the superior court to assess that impact in light of the other relevant factors in determining what is in the best interests of the child." (*LaMusga, supra*, 32 Cal.4th at p. 1097.)

Finally, "the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining ongoing custody arrangements." (*Burgess, supra*, 13 Cal.4th at pp. 32–33; see also *LaMusga*, at p. 1093; *Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989, 999 [20 Cal.Rptr.3d 522].)

B

Based on our review of the record on appeal, it appears the trial court misunderstood the proper legal standards to be applied in determining whether Father's move-away motion should be granted. Although the trial

court ostensibly applied the "best interest" test, its May 6, 2010, order reflected a misunderstanding of how that test applies in the circumstances of a move-away motion.[7]

First, the court's order denying Father's motion reveals a misunderstanding of the determination a trial court must make in deciding a move-away motion by a custodial parent. In this case, the trial court, in effect, avoided the ultimate question whether a change in custody would be in Child's best interests were the custodial parent (Father) to move to Washington. The court's order stated: "Nobody has informed the Court that [Father] absolutely will move even if the request is denied, so the court will not examine that question at this time and will assume that he is staying. Should [Father] return ex parte and inform the court that he will move regardless, the court will then determine whether a change in custody to [M]other is in the child's best interest[s]." However, "when the trial court is faced with a request to modify the existing custody arrangement on account of a parent's plan to move away (unless the trial court finds the decision to relocate is in bad faith), the trial court must treat the plan as a serious one and must decide the custody issues based upon that premise. The question for the trial court is not whether the parent may be *permitted* to move; the question is what arrangement for custody should be made [if and when the custodial parent moves]." (*Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1205–1206 [62 Cal.Rptr.2d 766], fn. omitted; see also *Brody v. Kroll* (1996) 45 Cal.App.4th 1732, 1736 [53 Cal.Rptr.2d 280].)

In this case, the trial court apparently did not properly treat Father's plan to move to Washington as a serious one and thereby avoided addressing the ultimate question raised by Father's move-away motion—i.e., what arrangement for custody would be in Child's best interests if and when Father moves to Washington? By misunderstanding and/or avoiding the fundamental question before it, the trial court abused its discretion. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at pp. 435–436; *People v. Belmontes, supra*, 34 Cal.3d at p. 348, fn. 8; *In re Carmaleta B., supra*, 21 Cal.3d at p. 496; *People v. Aubrey, supra*, 65 Cal.App.4th at p. 282; *People v. Marquez, supra*, 143 Cal.App.3d at p. 803; *Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at p. 655.)

To the extent the trial court may have been concerned that Father did not actually intend to move to Washington, the court could have made its determination of custody effective on his move to Washington. (Cf. *Niko v. Foreman, supra*, 144 Cal.App.4th at p. 365.) "[T]he law allows a court to conduct a hearing based on the *intention* to move and make a custody order conditioned on the move being effectuated. Such a conditional modification

---

[7] The order stated: "The standard to be applied to this case is the best interest[s] of the child."

order is not considered 'an advisory opinion.'" (*Ibid.*, quoting *Ruisi v. Thieriot, supra*, 53 Cal.App.4th at p. 1206.) To the extent the trial court denied Father's move-away motion with the goal of maintaining the status quo and/or coercing Father to abandon his plan to move to Washington, it erred. "[A] court must not issue such a conditional order [(e.g., changing custody to the noncustodial parent)] for the purpose of coercing the custodial parent into abandoning plans to relocate. Nor should a court issue such an order expecting that the order will not take effect because the custodial parent will choose not to relocate rather than lose primary physical custody of the children." (*LaMusga, supra*, 32 Cal.4th at p. 1098.)

Second, the trial court's order further reflected a misunderstanding of proper legal standards by stating: "*Father's reasons for the move*, that is to join a new wife and family, *are not sufficient* and a new wife and family in Washington is *not a sufficiently necessary reason to move* the residence of [Child] to Washington with [Father.]" (Italics added.) As discussed above, a custodial parent is *not* required to show a planned relocation is necessary. (*Burgess, supra*, 13 Cal.4th at pp. 28–29, 34; *LaMusga, supra*, 32 Cal.4th at p. 1088.) Although *LaMusga* included among the listed factors a trial court should consider in determining a move-away request "the reasons for the proposed move" (*LaMusga*, at p. 1101), a reading of the entire *LaMusga* opinion shows that a custodial parent's reasons for a proposed move should be considered by a trial court only when "one reason for the move is to lessen the child's contact with the noncustodial parent . . ." and then only in considering that factor with all the relevant factors in determining whether a change in custody would be in the child's best interests (*id.* at p. 1100). By considering whether Father's reasons for his proposed move to Washington were "sufficient" or "necessary," the trial court misunderstood and/or misapplied the proper legal standards in determining a move-away motion.

Finally, the trial court's order reflected an undue, if not sole, emphasis on the probability that Father's proposed move with Child to Washington could be detrimental to Child's relationship with Mother. Although a trial court should consider that factor in deciding a move-away motion, the trial court's order in this case appeared to reflect reliance on that factor to the exclusion of any other factors relevant in determining a move-away motion (e.g., the probable detriment to Child's relationship with Father were he to move to Washington without Child, and Child's need for continuity and stability in established custodial arrangements). (*LaMusga, supra*, 32 Cal.4th at p. 1097.) The court's order stated: "[T]he Court finds that there is a probability of a likelihood of erosion of ties to [Mother] if the move is granted. The high level of lack of communication between the parties could undermine [Child's] development. [¶] . . . If the move is granted[,] the impact of the relationship between [Child] and [Mother] will be significant. The move will likely exacerbate the current problems rather than improve

them." *LaMusga* stated: "[T]he detriment to the child's relationship with the noncustodial parent that will be caused by the proposed move, *when considered in light of all the relevant factors, may* warrant denying a request to change the child's residence or changing custody. The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances. We will generally leave it to the superior court to assess that impact *in light of the other relevant factors* in determining what is in the best interests of the child." (*LaMusga, supra,* at p. 1097, italics added.)[8] Accordingly, the detrimental effect of a move on Child's relationship with Mother is just one factor to be considered along with all of the other factors relevant in determining the best interests of Child. By citing only that one factor to the exclusion of all the other *LaMusga* and other relevant factors, we conclude the trial court unduly, if not solely, relied on the detrimental effect on Child's relationship with Mother in denying Father's move-away motion. In so doing, the court abused its discretion. The trial court omitted any reference to, and presumably thus ignored, one of the most important factors in determining a move-away motion—i.e., Child's need for continuity and stability in established custody arrangements. (*LaMusga, supra,* 32 Cal.4th at p. 1101.) *Burgess* stated: "[T]he paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker [(e.g., Father)]—weigh heavily in favor of maintaining ongoing custody arrangements." (*Burgess, supra,* 13 Cal.4th at pp. 32–33.)

To the extent the trial court indirectly referred to another *LaMusga* factor (i.e., the parents' relationship and ability to communicate and cooperate effectively), the evidence cited by the court does not support its finding on that factor. The court's order stated: "Page 3 of Dr. Volcani's report states that the parties seemed to be *co-parenting* in a relative[ly] *cooperative and stable manner.*" (Italics added.) However, the court then stated: "This is the basis for the Court's decision as the Court sees this statement as a red flag that *the parties are not communicating.*" (Italics added.) Based on our reading of Volcani's original and supplemental reports, we conclude there is insufficient evidence to support the court's finding that Mother and Father were not communicating at the time of the March 5, 2010, hearing on Father's

---

[8] *LaMusga* also stated: "We do not suggest that a showing that a proposed move will cause detriment to the relationship between the children and the noncustodial parent *mandates* a change in custody. But it is within the wide discretion of the superior court to order a change in custody based upon such detriment, if such a change is in the best interests of the children in light of all the relevant factors." (*LaMusga, supra,* 32 Cal.4th at p. 1095.) *Burgess* stated: "A trial court may consider the extent to which the minor children's contact with their noncustodial parent will be impaired by relocating. In so doing, however, it is not restricted to any particular formula for contact or visitation; nor is it required to make a custody determination that preserves the predissolution status quo." (*Burgess, supra,* 13 Cal.4th at p. 36, fn. omitted.)

move-away motion. On the contrary, there is only one reasonable interpretation of Volcani's reports—that although Mother and Father previously had some problems communicating and working together regarding Mother's visitation with Child, by the time of Volcani's February 22, 2010, supplemental report their communication in coparenting Child had improved to the extent that Volcani concluded: "Since the original evaluation, [Mother] and [Father] seemed to have been co-parenting [Child] in a relatively cooperative and stable manner." Volcani further noted both Mother and Father agreed that their communication and cooperation in coparenting Child had been "a lot better." Accordingly, contrary to the trial court's finding, Volcani's statement cannot reasonably be interpreted "as a red flag that *the parties are not communicating.*"[9] (Italics added.) Furthermore, neither Volcani nor Waldman (the FCS counselor) concluded, as the trial court did, that Child's anger and behavior issues showed "a lack of meaningful dialog between the parents" or were caused by "tension between [them]."[10] At most, Volcani reported that Child's therapist told him the tensions between Mother and Father "*could* be enough to fuel it [(Child's anger)]." (Italics added.) Absent sufficient evidence showing the actual or likely cause of Child's anger and behavior issues, it would be speculation for a court to conclude those issues reflect a lack of communication between the parents and are caused by tension between the parents.

Because the trial court apparently misunderstood the proper standards to apply in determining Father's move-away motion (and insufficient evidence supports some of its findings, as discussed above), we conclude the trial court abused its discretion in denying Father's motion to move away with Child to Washington. As we stated above, if a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law. (*People v. Belmontes, supra,* 34 Cal.3d at p. 348, fn. 8; *In re Carmaleta B., supra,* 21 Cal.3d at p. 496 ["discretion can only be truly exercised if there is no misconception by the trial court as to the legal

[9] Although the trial court did not refer to it, Waldman's February 10, 2010, report stated the parents have "great difficulty communicating" and that Father "may not be supportive of [Child's] relationship with" Mother. However, that report was completed, contrary to the trial court's direction, *without* consideration of Volcani's subsequent supplemental report that noted the parents' communication was substantially better and they had been coparenting Child "in a relatively cooperative and stable manner." On remand, the trial court should consider whether it is warranted to request that Waldman file an updated report reflecting Volcani's supplemental report and the current circumstances of Child and his parents and making a recommendation on Father's move-away motion based on proper legal standards.

[10] The trial court's order stated: "[T]he events of May of 2009 and the bruise on [Child's] back, [Child] speaking out in his sleep, the pants wetting, [Child] physically acting out, and the numerous calls to CPS all point to a lack of meaningful dialog between the parents. [¶] . . . Both [Child's] therapist and [Child's] day care teacher feel that [Child] is angry. The court feels that the anger is coming from the tension between the two parties."

basis for its action"]; *People v. Aubrey, supra,* 65 Cal.App.4th at p. 282; *People v. Marquez, supra,* 143 Cal.App.3d at p. 803 ["an erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion"].) Accordingly, we reverse the trial court's order denying Father's move-away motion and remand for the trial court to exercise its discretion de novo with a proper application of the legal standards, generally set forth in this opinion.[11] (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at pp. 435–436.) A discretionary order based on the application of improper criteria or incorrect legal assumptions is *not* an exercise of *informed* discretion and is subject to reversal even though there may be substantial evidence to support that order. (*Id.* at p. 436; *Caro v. Procter & Gamble Co., supra,* 18 Cal.App.4th at p. 655.) If the record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit that court to exercise *informed* discretion with awareness of the full scope of its discretion and applicable law. (*People v. Rodriguez, supra,* 17 Cal.4th at p. 257; *People v. Fuhrman, supra,* 16 Cal.4th at p. 944.)

IV

*Section 3044 Presumption*

Father contends the trial court erred by not considering and/or applying the section 3044 rebuttable, if not conclusive, presumption that Mother should not have custody because of her criminal conviction for battering Child.

A

Section 3044 provides in pertinent part:

---

[11] In so doing, the trial court may consider whether it is warranted to request Waldman, the FCS counselor, to issue an updated report with recommendations reflecting the current status of Child and his parents or, at least, to supplement her February 10, 2010, report to reflect Volcani's February 22, 2010, supplemental report. As noted above, contrary to the trial court's direction, Waldman issued her report without first receiving and considering Volcani's supplemental report. In particular, Waldman's report appeared to contain erroneous or incomplete information regarding Volcani's evaluation and report (e.g., despite Waldman's statement that Volcani had not met with Mother and Father during the past two years, Volcani's subsequent supplemental report showed that he, in fact, *had* met with Mother and Father on numerous occasions during the few months preceding his supplemental report). Also, in recommending Father's move-away motion be denied, Waldman's report did not appear to properly weigh the best interests of Child by considering relocation of Child with Father to Washington versus a change in the custody arrangement were Father to relocate without Child (e.g., change primary physical custody to Mother were Father to move away). The proper question is *not* whether it is in Child's best interests to move away with Father to Washington *or* to stay with Father in San Diego in Father's custody. If that were the applicable question, recommendations to grant move-away requests presumably would be rare and, if adopted or followed by trial courts, would discourage custodial parents from relocating, and possibly even coerce them into forgoing relocation.

"(a) Upon a finding by the court that a party seeking custody of a child has perpetrated *domestic violence . . . against the child . . . within the previous five years*, there is *a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest[s] of the child*, pursuant to Section 3011. This presumption may only be rebutted by a preponderance of the evidence. [¶] . . . [¶]

"(c) For purposes of this section, a person has 'perpetrated domestic violence' when he or she is found by the court to have *intentionally or recklessly caused* or attempted to cause *bodily injury . . . .*

"(d)(1) For purposes of this section, the requirement of a finding by the court shall be satisfied by, *among other things*, and not limited to, evidence that a party seeking custody has been *convicted within the previous five years, after* a trial or *a plea of guilty or no contest, of any crime* against the other party that comes within the definition of domestic violence contained in Section 6211 and of abuse contained in Section 6203 . . . ."[12] (Italics added.)

 A section 3044 finding of domestic violence "in a family law case changes the burden of persuasion as to the best interest test, but it does not limit the evidence cognizable by the court, and it does not eliminate the best interest requirement." (*Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1054 [96 Cal.Rptr.3d 298].) *Keith R.* stated: "The minor child's best interests must remain at the forefront of the family court's considerations on custody in determining whether the section 3044 presumption has been rebutted." (*Id.* at p. 1056.) That court explained: "The section 3044 presumption . . . does not change the best interest test, nor supplant other Family Code provisions governing custody proceedings. This presumption may be overcome by a preponderance of the evidence showing that it is in the child's best interest[s] to grant joint or sole custody to the offending parent. (§ 3044, subd. (b)(1).) Nor does the statute establish a presumption for or against joint custody; again, the paramount factor is the child's health, safety and welfare. [Citations.] And where the section 3044 presumption has been rebutted, there is no statutory bar against an award of joint or sole custody to a parent who was the subject of the order. [¶] This is particularly important in move-away cases . . . ." (*Keith R.*, at p. 1055, fn. omitted.)

B

Although the trial court's May 6, 2010, order did not make any express finding under section 3044 that Mother had perpetrated domestic violence

---

[12] Section 6211 defines "domestic violence" as including abuse perpetrated against "[a] child of a party." (§ 6211, subd. (e).) Section 6203 defines "abuse" as including "[i]ntentionally or recklessly to cause or attempt to cause bodily injury." (§ 6203, subd. (a).)

against Child within the previous five years, it referred to such domestic violence, stating: "The abuse to [Child] by [Mother] was clearly a huge event and it changed custody to [Father]."[13] However, there is nothing in the record showing the court considered the section 3044 rebuttable presumption and/or found that presumption had been rebutted by Mother.

## C

■ Father initially asserts the section 3044 presumption should be deemed *conclusive*, and not merely rebuttable, in this case because Mother pleaded guilty to battery of Child. However, he does not cite any case or other authority that supports his position. On the contrary, although *Keith R.* did not involve a criminal conviction, it nevertheless supports an interpretation that the section 3044 presumption is rebuttable and may be overcome by the offending parent, regardless of whether the act of domestic violence resulted in a criminal conviction. Furthermore, we are not persuaded by his argument that we should interpret the section 3044 presumption as conclusive in cases involving criminal convictions, despite the express language of section 3044 making it only rebuttable. Accordingly, we are not persuaded by Father's assertion that Mother's criminal conviction of battery against Child should result in a conclusive presumption that she should not obtain sole or joint legal or physical custody of Child for a period of five years.

Nevertheless, on remand of this matter, the trial court should expressly find whether Mother perpetrated an act of domestic violence under section 3044 and, if so, whether section 3044's presumption has been rebutted by Mother. (Cf. *Keith R. v. Superior Court, supra,* 174 Cal.App.4th at p. 1057.) "Before reaching any [decision on Father's move-away motion], the court should conduct a detailed review of the evidence presented at trial and carefully weigh *all* of the relevant factors required by section 3044." (*Ibid.*) Furthermore, in the event the court finds Mother perpetrated an act of domestic violence under section 3044 but concludes Mother has overcome its presumption, it nevertheless should consider Mother's act of domestic violence against Child, together with all of the *LaMusga* and other relevant factors, in determining whether it is in Child's best interests to grant Father's motion to move away with Child to Washington or to change the established custody arrangement (e.g., grant Mother primary physical custody).[14]

---

[13] Furthermore, although the record on appeal contains various references to Mother's battery of Child (i.e., burning of Child's arm with a curling iron), it does not contain a copy of any judgment showing her criminal conviction of that offense.

[14] Because this case involves disputed facts and the exercise of the trial court's discretion, we do not intend, by our statements in the factual and procedural background or our legal discussion in this opinion, to dictate or suggest any particular outcome on remand. (*Keith R., supra,* 174 Cal.App.4th at p. 1057.)

## DISPOSITION

The order is reversed and the matter is remanded for further proceedings consistent with this opinion.

Huffman, Acting P. J., and O'Rourke, J., concurred.