Filed 4/30/13  Ebrahimian v. Dental Bd. of California CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHAHAB EBRAHIMIAN et al., | B239646 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. BS131882) |
| DENTAL BOARD OF CALIFORNIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James A. Chalfant, Judge.  Affirmed.

Kamala D. Harris, Attorney General, Alfredo Terrazas, Senior Assistant Attorney General, Karen B. Chappelle and Geoffrey Ward, Deputy Attorneys General, for Defendant and Appellant.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Peter R. Osinoff and Theresa Taing for Plaintiffs and Respondents.

_____

The Dental Board of California revoked Shahab Ebrahimian's and Farhad Shafa's licenses to practice dentistry several years after they pleaded no contest to a single count of paying patient referral fees, a misdemeanor. The trial court granted Ebrahimian and Shafa's petition for writ of administrative mandamus on the ground revocation was an excessive penalty. On appeal the Dental Board argues the penalty imposed was within its broad discretion in light of Ebrahimian's and Shafa's submission of more than $100,000 in false MediCal billings and contends the trial court erred in requiring the Dental Board to prove fraudulent intent. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Audit and Criminal Convictions*

Ebrahimian and Shafa, classmates in dental school, were licensed to practice in July 1997. In August 1999 they formed a dental corporation and acquired Columbus Dental Group in Reseda; in 2001 they acquired Warner Dental Care in Canoga Park. Both practices were considered "high volume" and primarily treated MediCal patients.

In mid-2001 the California Department of Health Services (Department) placed Ebrahimian and Shafa on special claims review, generally triggered when there is suspicious activity, requiring them to obtain prior authorization before performing certain procedures. In 2003 the Department audited the dentists' billing records for the period January 10, 2000 through January 10, 2003. After reviewing X-rays and interviewing a sample of nine patients, Dr. Morton Rosenberg, the Department's expert, determined Ebrahimian and Shafa had been overpaid more than $140,000, including payment for the replacement of 394 fillings or "restorations" for 89 patients who did not actually receive the treatment.

In January 2005 the Department referred a complaint to the California Department of Justice Bureau of MediCal Fraud (Fraud Bureau). Special Agent Tuan Phung investigated the matter, interviewing Dr. Rosenberg and seven of the patients he had examined. In February 2006 the Fraud Bureau filed criminal charges against Ebrahimian and Shafa for grand theft (Pen. Code, § 487, subd. (a)), multiple counts of identity theft (Pen. Code, § 530.5, subd. (a)) and presenting false MediCal claims (Welf. & Inst. Code,

2

§ 14107, subd. (b)(4)(A)).  In December 2006 Ebrahimian and Shafa pleaded no contest to the misdemeanor offense of paying patient referral fees in violation of Business and Professions Code section 650.  Their sentences were suspended, and they were placed on probation for three years (2006 through 2009) and ordered to pay a combined total of $80,000 in restitution.

In August 2007 Ebrahimian and Shafa settled the Department's administrative claims against them for $110,000 with a credit of $80,000 for the restitution award they had paid in connection with the criminal case.

2. *The Administrative Hearing and Dental Board Decision*

Ebrahimian and Shafa disclosed their criminal convictions to the Dental Board.  In May and November 2009 the Dental Board commenced disciplinary proceedings against Shafa and Ebrahimian respectively.  The accusations alleged Ebrahimian and Shafa had been convicted of paying patient referral fees, which was undisputed, and also "had engaged in repeated acts of fraud by billing Medi-Cal for purported services on numerous patients that were never actually rendered."

a. *Testimony*

At the consolidated administrative hearing in November 2010 Agent Phung testified regarding his 2005 investigation, and his investigative report was admitted into evidence.  As discussed, based on Dr. Rosenberg's analysis and his own work, Agent Phung concluded Ebrahimian and Shafa had submitted claims and been paid by MediCal for replacing 394 fillings on 89 different patients for whom no dental work had been performed.[1]  In some instances Ebrahimian and Shafa had billed for fillings performed on both sides of patients' mouths in the same office visit and in other cases had billed for office visits occurring two days in a row—both of which practices, if they occurred, would be improper.  In addition, Agent Phung found Ebrahimian and Shafa had "up-coded" for services, such as billing for cleanings with fluoride when the charts did not reflect fluoride had been used.  They had also provided patients with porcelain enamel

---

[1]     The amount reimbursed per filling ranged from $35 to $85.

crowns, which were not permitted under MediCal rules, and billed for less expensive metal crowns, which were.[2] None of the Department's records regarding its investigation, including how it arrived at the overpayment figure of $140,000, was introduced into evidence.

Ebrahimian and Shafa testified they had largely ignored the administrative requirements of their practices after they purchased them and speculated the improper billing resulted from a combination of an inadequate billing program, staff errors, poor recordkeeping and their lack of oversight, partially because they were running two high volume practices. For example, they explained they would orally identify a new patient's existing fillings, which were to be noted on one piece of paper by the dental assistant, and then identify the procedures that needed to be performed, which were to be documented on a separate piece of paper. During this process the existing fillings may have been noted on a third piece of paper, the therapy record, which would then be provided to the person responsible for billing. In response to a question from the administrative law judge (ALJ) how this type of procedural error could result in a billing for phantom restorations over a two-day period, Ebrahimian testified, "[T]his is not something that I'm saying for sure happened, but a lot of times billers, when they're in there and they're experienced, when they see that there [are] some fillings on the left side and fillings on the right side, they—sometimes they bill it on different days, which is the wrong thing to do, obviously, but that could have been a possibility why that would have happened."

Ebrahimian and Shafa testified the majority of the $140,000 the Department found had been overpaid was for crowns: They explained they used porcelain-fused-to-metal crowns instead of the full metal crowns authorized by MediCal because no one wanted metal—they caused allergic reactions—and private insurance typically reimbursed for metal crowns under such circumstances. Ebrahimian testified the Department gave them the option of repaying $340 per crown or replacing the patients' porcelain crowns with

---

[2] Ebrahimian and Shafa testified they understood this practice is considered an illegal payment to the patient, which was the factual basis for their plea to the misdemeanor charge of paying patient referral fees.

4

metal ones. Ebrahimian and Shafa decided to pay the money back. Estimating only $11,000 to $15,000 of the overpayment was for restorations that had not been provided, Ebrahimian further explained some of the $140,000 was attributable to services provided by both offices, but improperly billed only under one of the office's provider number, as well as to the erroneous coding of X-rays and teeth cleaning. Ebrahimian and Shafa described changes they had implemented to ensure the errors did not recur, including hiring a dental practice consultant, purchasing new billing software, redesigning patient charts, training or replacing staff and personally verifying administrative functions were being performed properly. Although Ebrahimian and Shafa dissolved their partnership in 2004, they both described how their careers had developed.

b. *The decision*

On February 14, 2011 the ALJ submitted her proposed decision to the Dental Board recommending revocation of Ebrahimian's and Shafa's licenses. The ALJ found unpersuasive Ebrahimian and Shafa's explanation, "uncorroborated by any independent testimonial or documentary evidence," staff errors had caused the improper billing for restorations: "[Ebrahimian and Shafa] . . . place blame, in part, on inexperienced staff. The evidence, however, shows that [Ebrahimian and Shafa] purchased a practice that was an established fixture in the community. The staff from the previous practice would have been experienced in charting and billing. [¶] . . . [¶] [Ebrahimian's and Shafa's] assertion that there was a billing error caused by dental assistants, who charted their recommendations for future dental work needed as work actually performed, does not explain how billings, in some instances, ended up being divided over two days, with half being billed as having been performed on one day, and the other half as having been performed on the next day. If the false billings were caused by the dental assistant's notation errors, the billing for all fillings should have occurred on one day. . . . [¶] [Ebrahimian's and Shafa's] assertion that they provided patients with porcelain enamel crowns, when Denti-Cal would authorize only for metal crowns, evidences that [Ebrahimian and Shafa] engaged in activities they knew were prohibited under the Denti-Cal system."

In justifying revocation of their licenses, the maximum penalty notwithstanding Ebrahimian and Shafa had no prior criminal record and had successfully completed probation and paid restitution, the ALJ explained, "[Ebrahimian's and Shafa's] offenses were serious, and the convictions resulting from their actions are relatively recent [December 2006]. [Ebrahimian and Shafa] insist they did not engage in wrongdoing other than failing to adequately oversee their dental practice. At its best, the scenario urged by [Ebrahimian and Shafa] demonstrates a disregard of good dental practice, recordkeeping, poor supervision, and overbilling that resulted in their receiving over $140,000 to which they were not entitled. At its worst, this may be exactly what [Ebrahimian and Shafa] intended. [Ebrahimian and Shafa] did not demonstrate a full realization of what they did wrong and, therefore, what they needed to rehabilitate from. There is thus insufficient evidence to conclude that [Ebrahimian and Shafa] would not again commit similar misconduct in the future if confronted with the same circumstances."

The Dental Board adopted the ALJ's proposed decision in full on March 10, 2011 and ordered the revocation of Ebrahimian's and Shafa's licenses effective April 10, 2011. The effective date was stayed an additional 30 days to permit the Dental Board to decide a petition for reconsideration. The petition was denied, and the revocations were to take effect on May 10, 2011.

3. *The Amended Petition for Writ of Mandamus*

On May 9, 2011 Ebrahimian and Shafa petitioned for a writ of administrative mandamus (Code Civ. Proc., § 1094.5), challenging only the penalty imposed by the Dental Board, and also filed an ex parte application for a stay of the decision. The trial court granted an amended stay application, and the dentists filed an amended petition in early June.

At the outset of trial on November 29, 2011 the court announced its tentative decision to deny the petition, explaining it agreed with the ALJ that the dentists' explanation for the "false billings . . . does not particularly make good sense." The court found significant Ebrahimian and Shafa "did nothing to ascertain what actually

6

happened." Explaining it might have put Ebrahimian and Shafa on probation considering they had just started out in practice when the misconduct occurred, the court nevertheless indicated the Board did not commit a manifest abuse of discretion and thus it did not "see how [it] could do anything but uphold what the Dental Board did." After argument the court, characterizing the penalty as a "close call," adopted its tentative decision but agreed to grant a further two-week stay to permit Ebrahimian and Shafa to file a notice of appeal and seek a stay of the revocation in this court.

Within a few days of the hearing, however, the court set a status conference to inform the parties it had reconsidered its decision: "I reiterate my general feeling that [Ebrahimian and Shafa] committed a fraud by billing for services not performed, that is the 89 patients and 364 fillings, that the offense was serious and that [Ebrahimian and Shafa] did not show complete rehabilitation by investigating the underlying facts. On reflection, it seems to me that neither did the Dental Board do that. That is, the Dental Board presented a summary witness who did an investigation that was . . . the selection of random persons from the list of 89 patients who were interviewed to see whether or not they had the fillings that were filled. The Dental Board didn't do anything to check the records to ascertain whether [Ebrahimian and Shafa] committed fraud, and my general feeling they committed fraud is not the same thing as proof that fraudulent intent was shown in what [Ebrahimian and Shafa] did. So I think it's pretty clear, I think everybody agrees there was no actual proof of fraud. . . . The amount involved was $15,000 approximately."

In concluding the Dental Board abused its discretion in revoking the dentists' licenses, the court also found significant Ebrahimian and Shafa had no prior criminal record, had complied with the criminal probation, paid restitution, practiced for 10 more years without incident and with no patient complaints about the quality of dental care. On January 9, 2012 judgment was entered granting the petition and ordering the Dental Board to fashion "an adequate probationary order . . . that would appropriately monitor [Ebrahimian's and Shafa's] billing practices, in order to assure public protection."

7

## DISCUSSION

1. *Governing Law and Standard of Review*

Cause exists to revoke or suspend a professional's license when he or she is convicted of a crime substantially related to the qualifications, duties and functions of the profession. (See Bus. & Prof. Code, §§ 490, subd. (a), 1670.1; *Hanna v. Dental Board of California* (2012) 212 Cal.App.4th 759, 764 (*Hanna*).)[3] A conviction for MediCal fraud is such a crime and may warrant revocation of a professional's license. (See *Hanna*, at pp. 765; *Matanky v. Board of Medical Examiners* (1978) 79 Cal.App.3d 293, 305 ["[i]ntentional dishonesty, especially involving moral turpitude, demonstrates a lack of moral character and satisfies a finding of unfitness to practice medicine"].) A professional may also have his or her license revoked or suspended or be placed on probation for "unprofessional conduct, or incompetence, or gross negligence, or repeated acts of negligence . . . ." (Bus. & Prof. Code, § 1670.) Unprofessional conduct includes the unlawful act of rebating fees for professional services. (Bus. & Prof. Code, §§ 650, 1680, subd. (g).)

The Dental Board must consider the disciplinary guidelines entitled "Dental Board of California Disciplinary Guidelines With Model Language" in reaching a decision on a disciplinary action commenced under the Administrative Procedures Act. (Cal. Code Regs., tit. 16, § 1018.) As revised August 30, 2010 and operative December 14, 2010, the guidelines provide aggravating and mitigating factors to be considered, including the nature and severity of the offense; actual or potential harm to the public or any patient; prior disciplinary record; the number and variety of violations; evidence of rehabilitation; the time passed since the acts or offenses occurred; and the length of time in practice. Introductory language to the August 2010 revision to the guidelines states, "[W]ith the safety of the public being paramount and to the extent not inconsistent with public protection, disciplinary actions shall be calculated to aid in the rehabilitation of the

---

[3] Business and Professions Code section 493 provides the Dental Board may "inquire into the circumstances surrounding the commission of the crime in order to fix the degree of discipline . . . ."

licensee. . . . [¶] . . . [¶] If, at the time of hearing, the ALJ finds that the Respondent for any reason is not capable of safe practice, the Board favors outright revocation of the license. If, however, the Respondent has demonstrated a capacity to practice dentistry safely, a stayed revocation order with probation is recommended."[4]

"The propriety of a sanction imposed by an administrative agency is a matter resting in the sound discretion of that agency, and that decision will not be overturned absent an abuse of discretion." (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692; accord, *Hanna*, *supra*, 212 Cal.App.4th at p. 764.) We review "the administrative determination, not that of the superior court, by the same standard as was appropriate in the superior court." (*Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 501 (*Schmitt*).) "'Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed.' [Citations.] This rule is based on the rationale that 'the courts should pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed.'" (*Hughes*, at p. 692.) Generally, an administrative agency acts within its discretion if reasonable minds may differ regarding the propriety of the penalty imposed. (See *ibid.*) Nevertheless, while the agency has broad discretion, it is not unfettered. (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 217-218 [agency "does not have absolute and unlimited power"].)

---

[4]     As will be discussed, although the matter was submitted for decision on January 13, 2011, after the operative date of the August 30, 2010 Revised Disciplinary Guidelines, the ALJ referred to the earlier (November 1996) Disciplinary Guidelines, as well as to California Code of Regulations, title 16, section 1020, which lists criteria for consideration in evaluating rehabilitation when deciding whether to suspend or revoke a license on the ground of conviction of a crime. Section 1020(c) includes as factors the nature and severity of the acts or offenses, the licensee's total criminal record, the time that has elapsed since commission of the acts or offenses, whether the licensee complied with the terms of probation and restitution and other evidence of rehabilitation.

2. *The Dental Board Abused Its Discretion in Revoking Ebrahimian's and Shafa's Licenses*

Although we generally may not substitute our judgment a penalty is excessively harsh for that of the Dental Board's view it is appropriate, under the circumstances presented by the instant case we conclude the Dental Board abused its discretion in revoking the dentists' licenses. The Dental Board essentially concedes the ALJ failed to utilize the current disciplinary guidelines in her decision proposed to the Dental Board in February 2011—guidelines that stress the goal of licensee rehabilitation when, as here, the safety of the public is not jeopardized by discipline short of revocation. Citing *Borden v. Division of Medical Quality* (1994) 30 Cal.App.4th 874 (*Borden*), the Dental Board argues it was not required to consider the revised guidelines because the addition of "non-substantive" language emphasizing the primacy of licensee rehabilitation merely restates existing law, and the criteria for evaluating whether revocation, probation or suspension should be imposed were unchanged. The Dental Board's argument turns the *Borden* analysis on its head.

In *Borden* an administrative law judge found cause to discipline Borden, an anesthesiologist, after a patient had died and recommended Borden be placed on probation. (*Borden*, *supra*, 30 Cal.App.4th at p. 877.) On review the Division of Medical Quality of the Medical Board of California (Division) also found cause for discipline, albeit in connection with two patient deaths, and like the administrative law judge ordered only probation. After the Medical Board filed a petition for reconsideration, however, the Division issued a revised decision revoking Borden's license and finding, "The penalty imposed by the Division in the prior decision is not consistent with the recent legislative mandate raising protection of the public above all other concerns, including rehabilitation of the licensee." (*Ibid.*)

The trial court granted Borden's petition for writ of administrative mandamus in part, ordering the Medical Board to reconsider the penalty. (*Borden*, *supra*, 30 Cal.App.4th at p. 878.) The court found revocation of Borden's license had resulted from the improper retroactive application of an amendment to Business and Professions

10

Code section 2229 providing "'[p]rotection of the public shall be the highest priority for the [Division] . . . .'" (*Id.* at p. 879; see Stats. 1990, ch. 1597, § 14.) In reversing the trial court, the Court of Appeal rejected Borden's argument the amendment could not be applied retroactively, holding "public protection has always been a predominant purpose of the medical discipline system" and thus the amendment did not change existing law. (*Borden*, at p. 884; see *id.* at p. 882 [noting "well-established exception to the general rule that statutes are not construed to apply retroactively, i.e., when the legislation merely clarifies existing law"].)

Borden's holding, coupled with the Dental Board's concession the new language in the August 30, 2010 revision merely clarifies or restates existing law, reinforces our conclusion the ALJ and the Dental Board failed to effectuate the important policy favoring rehabilitation of a licensee as long as public protection is not imperiled. As in *Borden* the revision to the guidelines "did not change the penalty to which [the licensee] was subject" and did "not make a lawful act unlawful or change the penalty for the licensee's acts in a way that changes the legal effects of past events." (*Borden*, *supra*, 30 Cal.App.4th at p. 884.) Rather, the revisions simply provide the Dental Board with additional guidance in how to exercise its discretion. (*Id.* at p. 884.) By disregarding the well-established preference for rehabilitation rather than revocation, reemphasized but not created by the revised guidelines, the Dental Board failed to appreciate the scope and contours of its discretion. (See *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8 ["Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record."]; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 25 ["[i]f a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law"]; *Paterno v. State of California* (1999)

11

74 Cal.App.4th 68, 85 ["trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand"].)

Our conclusion the Dental Board abused its discretion is supported by the overbroad rationale provided by the ALJ in her proposed decision, adopted by the Dental Board, recommending revocation. The ALJ characterized the offenses as serious, explaining, "Respondents admitted receiving overpayments totaling $110,000. Respondents extensively billed Denti-Cal for services they did not perform." This summary, however, fails to distinguish between the types of misconduct at issue and the amount of improper payments attributable to each category. The Dental Board does not dispute Ebrahimian and Shafa's contention there was no more than $15,000 in billing for restorations that were not provided. While charging for metal crowns instead of the more expensive porcelain crowns provided to patients, billing under one office instead of two and mislabeling X-rays, conduct that resulted in the bulk of the $110,000 figure, may violate MediCal regulations, it is inconceivable that kind of misconduct would warrant revocation of the dentists' licenses. Clearly, charging for work that was not performed was the paramount factor in the revocation decision. But, as the trial court observed, while Ebrahimian's and Shafa's explanation for how that may have occurred was not credible, there was no finding the dentists had in fact engaged in fraud—the ALJ herself concluded only the dentists' conduct at best was a flagrant disregard of good practice and at worst "may be" intentional. The Dental Board is correct that proof of fraud is not necessary to justify license revocation. But, absent such a finding here, the penalty of revocation is too severe—that is arbitrary and capricious—based on the totality of the facts and the relatively benign nature of the other misconduct involved.

The ALJ's decision also characterizes the convictions as "relatively recent." The California Code of Regulations section 1020(c), cited by the ALJ, as well as the disciplinary guidelines, however, describe the relevant factor as the time that has elapsed since the acts or offenses occurred, not since conviction. Even if the outside date for the offenses was January 2003, more than eight years had passed since the offenses occurred. During that time Ebrahimian and Shafa had, among other things, modified their billing

practices to ensure errors would not be repeated, taken ethics classes, completed probation and paid restitution.  Moreover, there were never any patient complaints and no hint that the improper practices at issue jeopardized public safety (as opposed to the public fisc).

We reiterate it is rare to find an administrative agency abused its discretion in its choice of penalty.  Nevertheless, for a penalty range to have any meaning, revocation must be reserved for the most egregious cases, unless the licensee is not capable of safe practice.  Here, when no physical harm was occasioned, and in light of the long record of remedial action taken by the Ebrahimian and Shafa without any new incident of misconduct, revocation was an abuse of discretion.

## DISPOSITION

The judgment is affirmed.  Ebrahimian and Shafa are to recover their costs on appeal.


PERLUSS, P. J.


We concur:



ZELON, J.



JACKSON, J.

13