Filed 3/4/14  R.R. v. Heather F. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| R.R.,<br><br>          Respondent,<br><br>     v.<br><br>HEATHER F.,<br><br>          Appellant. | B246233<br><br>(Los Angeles County<br>Super. Ct. No. KF009993) |

APPEAL from an order of the Superior Court of Los Angeles County.  Rocky L. Crabb, Commissioner.  Reversed and remanded with directions.

Horvitz & Levy, David S. Ettinger, and Emily V. Cuatto; Harriett Buhai Center for Family Law, Betty L. Nordwind, and Katherine Ojeda Stewart; and Law Office of Johnna K. Boylan and Johnna K. Boylan for Appellant.

R.R., in pro. per. for Respondent.

_____

Heather F. appeals from an order denying her request to modify a visitation order involving her then six-year-old son. She argues the trial court abused its discretion in denying her requests for unmonitored visitation, a mid-week telephone call, permission to attend her son's school related and extracurricular activities, and information related to her son's health and wellbeing. For the reasons explained below, we agree that the court abused its discretion. Therefore, we reverse the order and remand the matter for further proceedings.

## BACKGROUND

Heather and respondent R.R. were in a relationship, but were not married when their son, Jordan, was born in December 2007. Jordan lived with Heather and R. until the couple separated in May 2009. After the separation, Jordan lived with Heather and her relatives. According to Heather, she attempted to arrange visits between R. and Jordan, and to involve R. in Jordan's life, but R. chose not to participate. R. denies Heather tried to facilitate visitation.

In November 2009, R. filed a petition to establish parental relationship under the Uniform Parentage Act. (Civ. Code, § 7610 et seq.) R. sought sole physical custody of Jordan, joint legal custody, and visitation for Heather to occur every weekend. Heather responded to the petition, requesting sole physical custody, joint legal custody, and weekend visitation for R. R. and Heather mediated their dispute and entered into an agreement on January 13, 2010, providing Jordan would live with Heather, the parties would share legal custody, and R. would have weekly and holiday visitation. In or about June 2010, Heather and Jordan moved in with Heather's fiancé and his sons.

In September 2010, Heather filed an order to show cause seeking a modification of the visitation agreement. She requested an order requiring R. to pick up and drop off Jordan at the police station during visits. She stated in her declaration that she was requesting the order because (1) R. was "inconsistent" in picking up Jordan for visits, and (2) she wanted to limit her contact with R. Heather claimed R. had been threatening, harassing and stalking her, her mother and her fiancé, "even during his visits with" Jordan, and had been sending her text messages stating he was not going to return Jordan

2

to her after visits. Heather explained she had reduced R.'s visitation to two times per month due to his threats to keep Jordan from her. She wanted the court to order two weekend overnight visits per month for R., plus holiday visitation and two non-consecutive weeks of vacation per year. Heather also complained about the inconsistency in parenting styles at her home and R.'s home. For example, she stated she was potty training Jordan, but R. refused to cooperate.

The parties tried mediation again, but could not resolve all of their disagreements, so the court set the matter for trial on January 24, 2011. In his trial brief, R. stated he agreed with Heather that the parties should pick up and drop off Jordan at a police station so they would be more likely to show up and be on time. At trial, R. claimed Heather was not making Jordan available for all of the visits. Heather disputed this claim.

After trial on January 24, 2011, the court issued an order requiring the parties to exchange Jordan at a particular sheriff station. The court awarded the parties joint legal custody and awarded Heather primary physical custody. The court ordered overnight visits for R. to occur every weekend except the second weekend of the month when Jordan would stay with Heather. The court also ordered Wednesday afternoon/evening visits for R. The holiday and vacation schedule set forth in the January 2010 agreement between the parties remained the same. The court ordered R. to pay child support. The court ordered Heather not to encourage Jordan to call her fiancé "daddy," after Heather conceded R.'s claim that Jordan was calling her fiancé "daddy," and she was not discouraging him. On March 1, 2011, the court entered the judgment of paternity with attached orders regarding custody, visitation and child support.

On August 24, 2011, R. filed an ex parte request for modification of the custody and visitation orders, seeking sole legal and physical custody of Jordan and no visitation for Heather. In his declaration, R. stated he noticed a bruise on Jordan's left cheek near his nose when he picked up Jordan from the sheriff station on August 19, 2011. R. took Jordan to a different sheriff station and filed a child abuse report against Heather. After interviewing Jordan, a deputy arrested Heather. R. stated in his declaration that he had noticed another bruise on the lower left side of Jordan's face two weeks before he saw the

3

second bruise on August 19, 2011. R. claimed Heather and her husband were physically abusing Jordan. R. stated he did not give Heather notice of the ex parte application because he believed she was in jail. The court declined to make any ex parte custody or visitation orders and set the matter for a full hearing.

The court held a hearing on September 8, 2011. Both parties appeared and represented themselves (as they had throughout the proceedings described above). Heather testified that the sheriff released her from custody after four days and there were no charges pending against her and none would be filed.[1] She further explained that a social worker made a safety plan with her under which Jordan would live temporarily with her mother and she would attend a parenting class. Heather stated she told the social worker she spanked Jordan on his bottom as a form of discipline and the social worker told her that was not illegal. Heather did not believe the Department of Children and Family Services (DCFS) had filed dependency proceedings against her. R. testified that he was having his visitation with Jordan during the time Jordan was staying with Heather's mother.

R. submitted six photographs to the court during the September 8, 2011 hearing. He testified that three of the photographs show the bruise on Jordan's left cheek on August 19, 2011, and three of the photographs show the bruise on the lower left side of Jordan's face a couple of weeks earlier. R. stated that he took the photographs. The photographs do not have dates on them.[2]

R. testified that he made a report at the sheriff station regarding the first bruise. According to R., deputies interviewed Heather and her husband and they said Jordan sustained the bruise while playing. Regarding the second bruise, R. testified that when he

_____

[1] Appellant's Appendix includes a Certificate of Release Letter from the Los Angeles County Sheriff's Department stating Heather was detained only and was not arrested on August 19, 2011, and was released on August 22, 2011.

[2] This court has reviewed the original color photographs submitted by R. and admitted into evidence at a later hearing on November 7, 2012.

4

and his girlfriend picked up Jordan at the sheriff station on August 19, 2011, they went next door to McDonald's. R.'s girlfriend noticed the bruise on Jordan's face and they asked him what happened. According to R., Jordan responded, "'Mom hit me in the face with a shoe.'" R. also testified that in or around July 2011, he noticed a bruise on Jordan's back and asked him what happened. According to R., Jordan responded, "'Mommy hit me.'"

Heather testified she did not know how Jordan sustained the bruises on his face. She stated that Jordan was an active child who liked to pretend he was Spiderman. He often fell and hurt himself while playing outside. Heather stated she had seen Jordan bump his face on tables and door knobs that are about his same height. According to Heather, a deputy spoke with Jordan regarding the first bruise and asked him if he hit himself on the table and Jordan responded affirmatively. Heather denied ever hitting Jordan on the head or face. She stated she had never seen a bruise on his back. In response to a question by the court, Heather testified she did not know why Jordan would "tell his father in the presence of a policeman that [she] hit him in the head with a shoe." The court accepted Heather's offer of proof that her mother, who was present in court, would testify that Jordan was an active child.

Heather called her sister, Erika, to testify at the September 8, 2011 hearing. Erika testified that she went with Heather to drop off Jordan at the sheriff station for his visit with R. on August 19, 2011. Erika took Jordan to the restroom to clean off his face, and she did not notice a bruise. After R. arrived, Erika saw him kneeling in front of Jordan. Erika testified: I find it weird that, if there was a bruise there, he would have seen it then [*sic*]." The court responded: "Well, ma'am, I find it weird that a police officer arrests your sister for four days on allegations of child abuse after talking to the child and looking at the child and that apparently there was bruising on the child at that time as depicted in these photographs that you didn't notice."

R. called his girlfriend, Daniqua, to testify at the September 8, 2011 hearing. She stated that she was waiting next door at McDonald's when R. picked up Jordan at the sheriff station on August 19, 2011. When R. and Jordan arrived, she noticed the bruise

5

on Jordan's face and asked him what happened to his face.  Jordan responded, "'Where?'"  Daniqua said, "'Right here by your nose.'"  According to Daniqua, Jordan told her, "'Oh, mommy hit me with a shoe.'"  Daniqua asked Jordan why his mother hit him with a shoe and Jordan said, "'Oh, because I was being bad.'"  Daniqua asked Jordan, "'Well, was it an accident?  Did she say "sorry"?'"  Jordan responded, "'No.  That's not very nice, huh?'"

The court asked Daniqua whether she had noticed any bruising on Jordan before and she responded affirmatively.  She testified that two weeks before the August 19, 2011 incident, she noticed a bruise on Jordan's left cheek.  The court showed Daniqua the six photographs R. submitted.  In three of the photographs, she recognized the bruise she had seen on Jordan's face on August 19, 2011.  The court asked her whether she had seen the bruise shown in the other three photographs.  Daniqua responded:  "Yes, I did.  And this is actually the bruise when he told [R.] and myself in unison that Heather's 'babe' hit him.  Heather's husband, she calls him 'Mama's babe.'"  The court asked Heather if she sometimes referred to her husband as "'babe,'" and Heather responded affirmatively.

In making its ruling, the court stated:  "Until the juvenile court makes orders in this case, the Court finds that there is danger to the minor child posed by the Respondent [Heather].  Based on the evidence that I have, it appears that the Respondent may have used a shoe to discipline the child and caused the bruising depicted in the photographs.  The bruising has occurred on more than one occasion.  It has occurred to his face on at least two occasions."  The court awarded joint legal custody, primary physical custody to R., and monitored visitation for Heather to occur every Sunday from 12:00 to 4:00 p.m., except the second Sunday of the month.  The court ordered that Heather's visits be monitored by her sister, Renee, or by a professional monitor at Heather's expense, and that the exchanges continue to take place at the sheriff station.  The court's order prohibited the use of corporal punishment as a means of disciplining Jordan.

On September 9, 2011, the day after the court modified the custody and visitation orders, DCFS closed its investigation of the abuse allegations without filing dependency proceedings.  Heather did not return to family court at that time and request a

6

modification of the visitation order based on this development. Instead, she complied with the September 8, 2011 order for monitored visitation, and voluntarily enrolled in parenting classes and individual counseling.

On July 26, 2012, after more than 10 months of monitored visitation, Heather filed a request for a modification of the visitation order. She sought a "step-up visitation plan," allowing her to have unmonitored visitation with Jordan every Sunday from 10:00 a.m. to 6:00 p.m. for three months. Thereafter, under the requested order, she would have unmonitored Saturday and Sunday visits from 10:00 a.m. to 6:00 p.m. every first, third and fifth weekend of the month for three months. Finally, she would have unmonitored visits from Saturday at 10:00 a.m. to Sunday at 6:00 p.m. She also requested a telephone call with Jordan every Wednesday from 6:00 to 6:15 p.m., permission to attend Jordan's school related and extracurricular activities with advance notice of such activities, information related to Jordan's health and wellbeing, and information which would allow her to exercise her joint legal custody rights (e.g., contact information for R., Jordan's doctor and Jordan's school).

Heather submitted a nine-page declaration in support of her request for a modification of the visitation order. In the declaration, she discussed her history of acting as Jordan's primary caretaker from his birth in December 2007 until the incident on August 19, 2011 when she was detained. She denied striking Jordan in the face with a shoe. She attached to her declaration a certificate of completion of a parenting class she voluntarily attended from January to March 2012 to learn how to discipline Jordan more effectively. She also attached a letter from her counselor stating Heather had attended individual counseling from September 2011 through April 2012 to become a better parent, and that the counselor was closing her case due to her progress.

Heather also discussed in her declaration her belief that "Jordan is being negatively impacted by his restricted time with [her]." Heather stated Jordan cries when visits end and he appears "sad and confused as to why he cannot spend more time with [her]." She requested the court grant her a 15-minute mid-week telephone call with Jordan to "allow Jordan to have some consistency in knowing he can see and talk to

[her]." Heather further explained: "He is a very small child, and I know that for him, days can seem and feel like months. I believe a telephone call mid-week will soothe him in knowing that he can see me soon, talk with me, and hear me tell him I love and miss him."

Heather expressed concern about her "lack of information as to Jordan's health and wellbeing." She stated in her declaration that despite her requests to R. for information she did not know who Jordan's doctor was or the status of his medical care, or where R. planned to enroll Jordan in school. She did not have a working telephone number for R. Heather explained that this lack of information made it difficult for her to exercise joint legal custody over Jordan as the court previously awarded.

In his responsive declaration, R. indicated he did not want the court to increase Heather's visitation beyond the four monitored Sunday visits per month. R. also stated: "I don't want her to have any Holidays [*sic*] unless it lands on the regular scheduled times." R. complained that "Heather is repeatedly late picking Jordan up." He also claimed Jordan reported that Heather went to the store and Renee (Heather's sister and the monitor) left the home during one of the visits and left Jordan with Erika (Heather's other sister) and Heather's husband. R. also claimed that he packs a lunch for Jordan when he has visits with Heather because Jordan told him Heather does not give him any food or drink during visits.

The matter proceeded to a hearing on September 14, 2012 after the parties were unable to settle it during mediation. Heather was represented by counsel during this hearing and R. represented himself. On Heather's hearsay objection, the court struck the portions of R.'s responsive declaration reporting what Jordan said regarding Heather and Renee leaving Jordan with others during a visit. The court asked Heather whether she had ever left Jordan with anyone other than Renee (the monitor) during a visit and she said she had not. Heather testified that she only left Jordan alone with Renee during a visit on one occasion for less than ten minutes when she went to the store to buy something for Jordan.

8

Regarding the August 19, 2011 incident, the court asked Heather why the deputy detained her. Heather stated it was because she told the deputy she "spanked [Jordan] on the bottom with [her] slipper." R. claimed the deputy told him Heather admitted to striking Jordan in the face with a shoe. The court explained to R. that the deputy's statements were hearsay and if R. wanted the court to consider them, R. would need to subpoena the deputy to testify. The court asked Heather if she ever told the deputy she "hit the child with anything in the face or head area." Heather responded, "No."

Heather's counsel pointed out to the court that DCFS closed its investigation of the abuse allegations on September 9, 2011, the day after the previous hearing at which the court modified the custody and visitation orders. The court commented: "As the Court is very familiar, they [DCFS] close files on cases that they shouldn't close files on regularly."

The court continued the matter to November 7, 2012 so it could hear testimony from the deputy regarding what Heather said about hitting Jordan. The court stated: "If it turns out in this case that all mother said was, 'I hit the child in the buttocks with a slipper,' that's one thing. 'I hit the child in the face with a shoe' is something a little different. So I want to get that fact cleared up."

On September 14, 2012, Heather filed a request for a statement of decision, asking the court to address each of the things she sought in her request for modification of the visitation order, including her requests for unmonitored visitation, a mid-week telephone call, permission to attend Jordan's school related and extracurricular activities, and information related to Jordan's health and wellbeing.

R. subpoenaed Deputy James Shull for the November 7, 2012 hearing and the deputy appeared and testified. Deputy Shull stated that on August 9, 2011, R. told him he had noticed bruising on Jordan "during several custody exchanges." R. showed Deputy Shull that Jordan "had a bruise on the left side of his face." Deputy Shull described the bruise as being the size of a quarter. R. told Deputy Shull he believed Jordan was being abused. Later that day, Deputy Shull went to Heather's residence to speak with her. Deputy Shull testified: "And she told me that her child does get into things as a typical

9

child would, has bruises that arise from doing those things. I asked her did she ever spank her child or anything like that. She said, 'No, not particularly. However, I did hit him just the other day with my shoe.'" According to Deputy Shull, Heather stated she had hit Jordan across the arm with the shoes she was wearing.[3] Deputy Shull described the shoe as "a woman's flat type shoe" that was "like a half breed between" a shoe and a slipper.

Deputy Shull also testified that he spoke with Jordan on August 19, 2011, and Jordan told him Heather had hit him in the face with a shoe and had spanked him on the bottom with a belt. Deputy Shull inspected Jordan's body, including his bottom. Deputy Shull stated: "The only markings I could find on his whole entire body was that on his face. Other than that, there was no other markings, no other redness, nothing else that I could recall that indicated the child was injured any other way." Deputy Shull believed Jordan was credible and that is why he arrested Heather. Jordan told Deputy Shull he was not afraid of Heather and he felt safe in her home.

R. testified during the November 7, 2012 hearing that Heather had arrived at the sheriff station two to five minutes late to pick up Jordan on at least two occasions. He stated he denied her a visit on October 7, 2012, and left with Jordan after she arrived at the sheriff station, because she was three minutes late.

Before making its ruling, the court stated to Heather's counsel: "Here's the problem. Your client continues to this moment, as near as I can tell, to deny that she hit the child in the face with her shoe. The Court believes that, in fact, she did hit the child in the face with the shoe. [¶] . . . [¶] As long as she sits here denying that, her visitation will remain supervised." The court also stated: "It can be 20 years from now and if I believe that she continues to falsely deny her prior child abuse, then I can't trust her." The court further commented that Heather used the term "slipper" to "minimize the

---

[3] Heather's counsel stated during argument at the November 7, 2012 hearing that Heather admits she attempted to strike Jordon on his bottom with her shoe and the shoe hit his arm when he moved his arm. Later in the hearing, Heather told the court the same thing.

gravity of hitting the child."  The court ruled, "The existing orders will remain in full force and effect with regard to visitation."  The court admitted into evidence the six photographs of Jordan's face that R. had submitted at the September 8, 2011 hearing and also at this November 7, 2012 hearing.

On November 20, 2012, the court issued a tentative statement of decision.  On November 30, 2012, Heather filed numerous objections.

On December 7, 2012, the court issued a final eight-page statement of decision.  The court stated, in pertinent part:

"After considering all admissible evidence, the Court finds that it is not in the best interests of the minor child to modify the orders made 9-8-11.  The Court finds the testimony of deputy Shuller [*sic*] to be credible, including his testimony that the minor child confirmed that respondent had hit the child in the face with her shoe.  The statements of the child to the deputy came into evidence without objection from respondent or her counsel.

"Respondent continues to 'adamantly' deny her abuse of the child, seeking to minimize her conduct, and to minimize the child's injuries.  The Court finds that the testimony of respondent is both generally and specifically not credible.  The Court finds that the denial of respondent is a false denial.

"While it is certainly possible that a physically abusive parent can change their conduct, and learn not to abuse a minor child, it is of great concern to this Court that respondent cannot acknowledge her past misconduct as a start to changing her future conduct.

"Respondent's denial of abusing this small child is pathological in nature.  Apparently she believes that if she denies the abuse long enough, and is 'adamant' about it that this will somehow change the facts.  Respondent is mistaken.  The Court has no confidence in the respondent's claims that she has improved her parenting skills and is no longer a threat to the health, safety, and welfare of the child.  That is not to say that respondent is foreclosed from ever having unmonitored visitation with the child, as she wants to argue.

11

"The Court finds that by a preponderance of the evidence, the respondent did use her shoe to strike the child's face, causing bruising to the child's face in August, 2011. The child's face was bruised at least twice in August 2011. This occurred on at least one occasion in mid-to-late August, 2011, wherein the respondent was the assailant. Whether it was respondent or her husband Ruben G[.], who was responsible for the child's first facial bruising in early August, 2011, is not entirely clear. This Court remains very concerned for the safety of the child in an unmonitored situation with respondent.

"It is also noted that since the child's visitation with the respondent became monitored over one year ago, the child apparently no longer suffers with facial bruising, or being hit with a shoe, 'slipper,' or belt."

The court did not address Heather's requests for a mid-week telephone call, permission to attend Jordan's school related and extracurricular activities, or information related to Jordan's health and wellbeing in its statement of decision, even though Heather had made a written request that these issues be addressed in the statement of decision.

On January 22, 2013, the court issued its order denying Heather's request for modification of the visitation order.

### DISCUSSION

Heather contends the trial court abused its discretion in denying her requests for unmonitored visitation, a mid-week telephone call, permission to attend Jordan's school related and extracurricular activities, and information related to Jordan's health and wellbeing. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [abuse of discretion standard applies to review of visitation orders].) We agree.

The record demonstrates the trial court failed to exercise its discretion at all in denying Heather's requests for a 15-minute weekly telephone call with Jordan and permission to attend Jordan's school related and extracurricular activities. The court did not address these requests at the hearing or in its statement of decision, even though Heather specifically asked the court to address these requests. The reasons the court

listed in its statement of decision for denying Heather's request for unmonitored visitation—the physical abuse and Heather's denial of the physical abuse—are not reasons for denying Heather's requests for a telephone call and permission to attend Jordan's school related and extracurricular activities in a public setting. Based on our review of the record, we cannot conceive any valid reason for denying Heather a weekly telephone call with Jordan and permission to attend Jordan's school related and extracurricular activities. Accordingly, we direct the trial court to issue an order on remand granting Heather a weekly telephone call with Jordan, requiring R. to provide adequate notice to Heather of all of Jordan's school related and extracurricular activities (e.g., parent-teacher conferences, school performances, sporting events, etc.), and permitting Heather to attend these events and activities. After holding a hearing on the matter, the trial court may fashion appropriate orders aimed at minimizing conflict between R. and Heather regarding notice of and attendance at these events and activities.

The trial court also abused its discretion in failing to address and grant Heather's request for information related to Jordan's health and wellbeing. The information Heather seeks—contact information for R., Jordan's doctor, dentist and school, and access to medical, dental and school records—is essential for Heather to exercise her joint custody rights in any meaningful way. The parties' shared legal custody was not a disputed issue during the hearings which resulted in the order at issue on appeal. Moreover, as Heather points out, the Family Code provides that, "[n]otwithstanding any other provision of law, access to records and information pertaining to a minor child, including, but not limited to, medical, dental, and school records, shall not be denied to a parent because that parent is not the child's custodial parent." (Fam. Code, § 3025.)[4] We direct the trial court to issue an order on remand requiring R. to provide to Heather his current home address and working telephone numbers (home, work, mobile) where

---

[4] Further statutory references are to the Family Code.

13

Heather can reach him,[5] contact information for Jordan's doctor, dentist and school, and to update this information if changes occur. The order also should require R. to disclose to Heather medical, dental and school related information R. receives regarding Jordan (e.g., prescriptions, medical or dental care instructions from a health care provider, report cards and progress reports from school, etc.).

With regard to Heather's request for unmonitored visitation as part of a step-up plan, the trial court applies "the child's best interest standard." (*In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1080.) In determining the child's best interest, the court should consider various factors, including the health, safety and welfare of the child, any history of abuse by a parent, and the nature and amount of contact with both parents. (§ 3011; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 20.)

The "health, safety, and welfare of children [is] the court's primary concern in determining the best interest of children when making any orders regarding . . . visitation of children." (§ 3020, subd. (a).) "[I]t [also] is the public policy of this state to assure that children have frequent and continuing contact with both parents after the parents have . . . ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except where the contact would not be in the best interest of the child." (§ 3020, subd. (b).)

A trial court may abuse its discretion where it ignores relevant factors and relies on only one factor in making its best interest determination. (See *F.T. v. L.J.*, *supra*, 194 Cal.App.4th at pp. 24-26.) Here, the trial court based its best interest determination on the bruising to Jordan's face in August 2011, and its finding Mother lied about the manner in which Jordan sustained the bruising.

Mother admitted she had spanked Jordan with a shoe, but denied she hit him in the face. She had never stated otherwise, although the trial court initially believed she had

---

[5] For Heather to exercise her legal custody rights and access information regarding Jordan's health and wellbeing, this requested contact information is necessary because R. has primary physical custody of Jordan.

given inconsistent statements. Deputy Shull concluded Jordan's statements that Heather hit Jordan in the face with a shoe were credible. Therefore, he arrested her. The sheriff released her from custody three days later and indicated she had been detained, not arrested. No criminal charges were filed against Heather. DCFS investigated the abuse allegations and decided not to file dependency proceedings. DCFS did not conclude Jordan needed protection from Heather in the form of monitored visitation or reunification services. Nonetheless, Heather voluntarily took a parenting class and participated in more than six months of individual counseling to improve her parenting skills. More than a year had elapsed between the time Jordan sustained the bruising to his face and the trial court denied Mother's request for unmonitored visitation. Under these circumstances, we find the trial court's consideration of the August 2011 abuse and Mother lying about the abuse, to the exclusion of other relevant factors outlined below, constitutes an abuse of discretion.

There is no indication the trial court considered the nature of the relationship between Heather and Jordan or the importance to Jordan of more frequent contact with Heather. Undisputed evidence demonstrates Heather was Jordan's primary caretaker from the time of his birth in December 2007 until August 2011 with no incidents of abuse alleged. Then, Jordan's contact with Heather was reduced to four, monitored day visits per month. Heather was not even permitted a 15-minute telephone call per week to maintain her connection with Jordan.

The trial court ignored R.'s efforts to interfere with Heather's relationship with her son which were shown by undisputed evidence. As discussed above, despite the fact that Heather shared joint custody of Jordan, R. refused to allow Heather to participate in decisions regarding medical care, schooling and extracurricular activities. When Heather brought these facts to the court's attention, the court did not order R. to allow Heather to exercise her joint custody rights. Nor did the court admonish R. when he admitted he left the sheriff station with Jordan because Heather arrived three minutes late for a visit. The court should have evaluated Heather's request for a modification of the visitation order in

15

light of R.'s interference with Heather reestablishing a more meaningful relationship with Jordan.

We conclude the trial court abused its discretion in failing to consider all relevant factors in making its best interest determination when it denied Heather's request for unmonitored visitation. We remand the matter for a new hearing during which the court must consider all relevant factors in determining whether it is in Jordan's best interest to grant the requested modification. The court must evaluate the importance to Jordan of more frequent and liberalized visitation with Heather, as well as the impact of R.'s interference with Heather's exercise of her monitored visitation and the award of joint custody.

## DISPOSITION

The order denying Heather's request for modification of visitation is reversed and the matter remanded for a new hearing during which the trial court must consider all relevant factors in determining whether it is in Jordan's best interest to grant Heather's requests for unmonitored visitation. The trial court is directed to issue orders (1) granting Heather a weekly telephone call with Jordan; (2) requiring R. to provide adequate notice to Heather of all of Jordan's school related and extracurricular activities, and permitting Heather to attend these events as appropriate; (3) requiring R. to provide to Heather his current home address and working telephone numbers (home, work, mobile) where Heather can reach him, contact information for Jordan's doctor, dentist and school, and to update this information if changes occur; and (4) requiring R. to disclose to Heather medical, dental and school related information R. receives regarding Jordan. Heather is entitled to recover costs on appeal.

NOT TO BE PUBLISHED.

16

CHANEY, J.

We concur:


ROTHSCHILD, Acting P. J.


MILLER, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.