Filed 1/10/23  In re A.B. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | D080747 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. C.B., Defendant and Appellant. | (San Diego County Super. Ct. No. J519586B) |

APPEAL from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

C.B. (Mother) appeals from the juvenile court's orders denying her Welfare and Institutions Code[1] section 388 petition and terminating parental rights to son A.B. (§ 366.26.) She contends that the juvenile court abused its discretion by denying her section 388 petition because she had shown a sufficient change of circumstance and the request was in A.B.'s best interest. She also asserts the juvenile court erred in finding that the parental-benefit exception to adoption did not apply because she maintained consistent visitation and had a positive relationship with A.B. that benefited him. (§ 366.26, subd. (c)(1)(B)(i).) We reject these contentions, and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

*Family History*

A.B. was born in August 2020. At the time of his birth, Mother was incarcerated for the last six months on a felony robbery charge and a parole violation and she anticipated serving another 12 months in prison. She also had a history of mental health problems, drug use and homelessness. Mother had another child previously removed from her care due to her drug use during pregnancy. She then failed to reunify with that child and lost parental rights in 2019.

*The Agency's Petition*

On August 10, 2020, San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of A.B. under section 300, subdivision (g). At the detention hearing the following day, the juvenile court made a prima facie finding that continued placement with Mother is contrary

---

1    All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

2

to A.B.'s welfare and detained A.B. in out-of-home care. The court ordered supervised visits for Mother, subject to her facility's rules.

Mother failed to arrange for A.B.'s care and although she wanted A.B. to be released to the maternal grandmother, the maternal grandmother was ambivalent about caring for A.B. and the Agency had concerns about her suitability. The location of the alleged father, B.M., was unknown when A.B. was born and Mother reported no contact with him.[2]

The Agency's August 2020 jurisdiction/disposition report recommended that the court make a true finding on the petition, declare dependency on behalf of A.B., and place him in a licensed foster care home. It further recommended that Mother be denied reunification services pursuant to sections 361.5, subdivision (b)(12) and 361.6, subdivision (e)(1). At the September 2020 jurisdictional and dispositional hearing, the court ordered a paternity test and set the case for trial.

The Agency's October 2020 addendum report stated that Mother received a phone card and scheduled times to call A.B.'s caregiver, however she called only once and struggled to maintain a conversation. The social worker reminded Mother to ask her prison counselor about what services are available while she is incarcerated. At the adjudication and disposition hearing in October, the court designated B.M. as the biological father based on the paternity test results and ordered supervised visits.

The Agency filed an amended petition in November 2020 on behalf of A.B. under section 300, subdivision (b)(1). The contested hearing was continued twice in order to allow Mother to attend. In its January 2021 addendum report, the Agency reported that the Mother expected to be

---

[2]    The father does not appeal and did not join in Mother's appeal. He will be mentioned here only when necessary to explain the proceedings.

released from custody in October 2021 and that she wanted to participate in services. The social worker again reminded her to speak with her prison counselor about any available services and programs. Mother requested parenting classes and the Agency submitted a referral.

At the February 2021 contested hearing, the juvenile court dismissed the section 300, subdivision (g) count and made a true finding on the section 300, subdivision (b)(1) count. The court declared A.B. a dependent, removed him from Mother's custody, found it was not in his best interest to be placed with the biological father, B.M., and placed him with a relative. The court ordered reunification services for B.M. but denied them for Mother.

*Reunification Period*

In its August 2021 status review report, the Agency reported that Mother had been transferred to Custody to Community Transitional Reentry Program (CCTRP) in May 2021. Mother reported her desire to visit and reunify with A.B., and her belief in her readiness to parent him. In its addendum report, the Agency reported that Mother moved to a sober living facility in September 2021. The social worker submitted a referral for Mother to visit A.B. at the Family Visitation Center and, beginning in October 2021, she began visiting him. During the visits, Mother played with A.B., offered him snacks, talked to him and praised him. A few times, Mother had to be reminded to supervise him more closely. At the end of the visits, A.B. did not display any distress after leaving Mother.

Meanwhile, B.M. did not participate in parenting services, he missed appointments with A.B. and he told the social worker he did not know if he wanted to reunify with A.B. The Agency had concerns about his mental health and substance abuse. At the six-month review hearing, the juvenile

4

court terminated B.M's reunification services and referred the matter for a section 366.26 hearing.

*Section 388 Petition*

In May 2022, about a month prior to the contested section 366.26 hearing, Mother filed a petition for modification pursuant to section 388 to set aside the court's orders denying her reunification services and scheduling a section 366.26 hearing. She requested the court vacate the contested hearing, develop a plan to transition A.B. into her care and close the case. In the alternative, she requested reunification services. She stated she engaged in services to address her substance abuse issues.

The Agency filed an addendum report expressing opposition to Mother's petition. Mother started her first substance abuse treatment program in March 2022, and her substance abuse counselor noted that she was participating in individual and group sessions a few times a week and making "good progress." Nevertheless, the counselor also reported that Mother had to leave her sober living facility due to an incident involving another resident, that the program would not provide her any other housing assistance and that she moved into a motel. Mother visited with A.B. consistently beginning in October 2021, but she failed to reach out to the caregiver between visits to see if she could provide A.B. any additional support.

The Agency assessed that Mother failed to demonstrate changed circumstances in her petition. Although she was making positive changes in her life, she was not able to take on a full parental role with A.B. With regard to whether placement with Mother was in A.B.'s best interest, the Agency noted that Mother had a history of substance abuse, mental health issues, and criminal activity. Mother reported she became sober when she went into

5

custody in February 2020. Prior to that, Mother had arrests in 2017, 2019 and 2020 related to drug use. In addition, she had a juvenile dependency case in 2017 related to drug use. Social worker Nguyen observed, "It appears that [Mother's] current longstanding sobriety is due to her incarceration and being released into a sober living home."

On June 9, 2022, the court addressed Mother's section 388 petition and determined she failed to make a prima facie showing of changed circumstances. At best, Mother's circumstances were in the early stages of changing, but had not changed. In addition, Mother did not make a prima facie showing that continued services or placement with the mother would be in A.B.'s best interest.

*Contested 366.26 Hearing*

At the July 2022 hearing, the court accepted the following Agency reports into evidence: the January 2022 section 366.26 report and addendum reports of January 2022, April 2022, May 2022, June 2022, July 2022. Mother testified she visited A.B. weekly and that he smiled, called her "mamma," sometimes wanted to be picked up and was comforted by her when he got bored. She believed he would miss her if their contact ended and that they had a bond because he stared at her when she left and because they played together.

The court found A.B. was both generally and specifically adoptable. It noted when Mother was in custody, visits in her facilities were not permitted due to "covid restrictions." Mother also never attempted to inquire about A.B.'s well-being while in custody, although she sought visitation with A.B. a month after her release and then continued to visit consistently. On balance, however, the court found "that there is no regular visitation and contact under the first prong, and that is not met."

6

The court next examined the relationship between A.B. and Mother. It noted they had a positive relationship, but not "much different than a child could experience with . . . a friendly visitor." The court determined that there was not a beneficial relationship "such that if the visits were to stop, that child would suffer harm." Finally, the court assessed whether the harm of severing the relationship outweighed the benefits of adoption. It found that the relationship was not so important to A.B. that it outweighed the security and stability of adoption. As a result, the court terminated parental rights and ordered a plan of adoption.

## DISCUSSION

Mother now appeals from the juvenile court's summary denial of her section 388 petition and the court's finding that she failed to prove the beneficial parent-child relationship exception to adoption.

## SECTION 388 PETITION

A. *Legal Principles*

"Section 388 provides an ' "escape mechanism" ' for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated. [Citation.] This procedural mechanism, viewed in the context of the dependency scheme as a whole, provides the parent due process while accommodating the child's right to stability and permanency. [Citation.] After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

"[A] section 388 petition seeking reinstatement of reunification services or return of the child will necessarily involve a parent who has made mistakes sufficient to support termination of services at some point in the past. The question must be whether the changes the parent made since then are substantial enough to overshadow that prior determination, such that reunification is now in the child's best interests." (*In re J.M.* (2020) 50 Cal.App.5th 833, 848.) "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*Id.* at p. 846.)

At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) A modification petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id.* at p. 318.) A proper exercise of discretion is " 'not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles . . . to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.) Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.)

B. *Analysis*

In her section 388 petition, Mother asked the court to set aside its February 2021 order denying her reunification services and its September 2021 order scheduling a section 366.26 hearing. Mother's petition also requested that the court order a plan to place A.B. with her and close the case, or, in the alternative, revert the case back into a reunification phase and order services for her. On appeal, Mother contends the court erred by finding that she had not made a prima facie showing under both prongs of the statutory analysis.

*Changed Circumstances*

As evidence of changed circumstances, Mother alleged she "engaged in services to address substance abuse issues." She also claimed she visited regularly with A.B. and has "created a strong, healthy, and vital bond." Mother alleged she had shown she could "safely care for her son" and he "deserve[d] the opportunity to grow up with his mother."

The court considered Mother's claims in the context of the entire case history. It credited Mother for her progress but found it constituted the "very early stages of changing circumstances, but not changed circumstances, as is required."

On the record before us, we conclude the court did not abuse its discretion. The Agency's June 2022 addendum report commended Mother for starting to make positive changes in her life, but also explained she had failed to demonstrate a true change in circumstances. Mother's substance abuse history spanned five years and she was only able to initiate sobriety by being arrested and incarcerated several months before A.B. was born in August 2020. Social worker Nguyen pointed out that Mother's substantial period of sobriety was primarily because she had been incarcerated. Mother

9

also made "good progress" at the substance abuse program and attending groups and individual sessions "a few times a week," but she had only been in that program for a little over two months at the time of the hearing. As the court observed, the mother's petition only set "forth very early stages of changing circumstances, not changed circumstances, as is required." This is a reasonable interpretation of all the evidence and does not constitute an abuse of discretion.

In her appeal, Mother claims that the court failed to consider that she "successfully completed" CCTRP. The record, however, only contains evidence she attended it for a period of time, not that she completed the program. There was no specific information offered about the services Mother participated in, her progress, or her prognosis. Similarly, in her petition, Mother did not plead anything concerning the program or attach any information concerning her participation in it.

Mother had additional struggles and there were additional protective issues that she failed to address in her petition. As Mother acknowledges, she also experienced homelessness and mental health problems. Moreover, the court also correctly observed that Mother failed to make a prima facie showing of changed circumstances concerning her history of criminal behavior and failure to make provisions for A.B.'s care. Mother was diagnosed with schizophrenia, she had experienced psychosis in the past, and she failed to reunify with A.B.'s sibling. There was no assertion on the face of her petition that there was a change of circumstances in relation to these significant protective issues.

The court did not abuse its discretion when it determined Mother failed to make a prima facie showing of changed circumstances. On that basis alone, the court's summary denial of the petition was proper. (*In re Zachary*

10

*G.* (1999) 77 Cal.App.4th 799, 806; *see also In re Justice P.* (2004) 123 Cal.App.4th 181, 191.)

*A.B.'s Best Interests*

The concept of a child's best interest " 'is an elusive guideline that belies rigid definition.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66, quoting *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.) Its purpose is to maximize a child's ability to mature into a stable, well-adjusted adult. (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1124.) Courts assessing petitions for modification filed after termination of reunification services should remember the shift in focus to a child's need for permanency and stability. (*In re I.B.* (2020) 53 Cal.App.5th 133, 159; *In re J.C.* (2014) 226 Cal.App.4th 503, 527 citing Seiser & Kumli on Cal. Juvenile Courts Practice & Procedure (2014 ed.), Dependency Proceedings, [Seiser] § 2.140[5], p. 2–473.)

The court did not abuse its discretion in determining that Mother failed to show that A.B.'s best interests would be served by placing him in her care or reverting back to the reunification stage. A.B. had been under juvenile court supervision since shortly after he was born, in foster care since he was 17 days old and was in need of stability. Mother never parented A.B., nor did she start visiting or establishing any relationship with him until after he was a year old. She never advanced past supervised visits and never asked how she could be more involved and offer support. In addition, Mother had a history of homelessness and, shortly before the hearing, she was asked to leave her sober living home and was staying in a motel. The reunification timeline was past the 18-month limit and the 24-month date was only two months away, by the time of the hearing. Indeed, "[a]fter the termination of reunification services, the parents' interest in the care, custody and

11

companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability', and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M.*, *supra,* 7 Cal.4th at p. 317, quoting *In re Marilyn H.* [(1993)] 5 Cal.4th 295, 309.)

The court did not abuse its discretion in finding that Mother failed to make a prima facie showing that the requested modification was in A.B.'s best interest. Thus, the court did not abuse its discretion when it denied Mother an evidentiary hearing on her section 388 petition.

## BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION TO ADOPTION

Mother also argues that the court erred when it did not apply the exception to adoption under section 366.26, subdivision (c)(1)(B)(i).

A. *Legal Principles*

Once the court found A.B. was likely to be adopted, a finding Mother does not contest, the burden shifted to her to prove, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights applies. (§ 366.26, subd. (c)(1)(A) and (B); *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re N.S.* (2020) 55 Cal.App.5th 816, 853.) At this stage of the proceedings, the statutory exceptions to adoption merely permit the court, in exceptional circumstances, to choose an option other than the adoption norm. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.)

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "[W]hen the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to

12

the court taking jurisdiction have not been resolved." (*Ibid*.) The purpose of a section 366.26 hearing is to determine and implement the appropriate permanent plan for a dependent child. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 304.) The juvenile court can choose among three permanent plans: adoption, legal guardianship, and long-term foster care. (§ 366.26, subd. (b).) When a child is adoptable, adoption is the preferred permanent plan unless there are countervailing circumstances or adoption is not in the child's best interest. (*In re Heather B.* (1992) 9 Cal.App.4th 535, 546; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

At a section 366.26 hearing, it is the parent's burden to show an exception to termination of parental rights. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) One exception is when the juvenile court finds "a compelling reason" for determining that termination of parental rights would be "detrimental" to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The California Supreme Court has clarified that the " 'compelling reason' " language does not impose on the parent any burden beyond the requirement to show termination of the beneficial relationship would be "detrimental" to the child. (*Caden C.*, *supra*, 11 Cal.5th at pp. 635–636.)

*Caden C.* stated that under section 366.26, subdivision (c)(1)(B)(i), a parent has the burden to show, by a preponderance of the evidence, three prongs: (1) "regular visitation and contact with the child"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to

13

the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra,* 11 Cal.5th at p. 636.) Specifically, in making the determination of whether the beneficial parent-child relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) Because interaction between a child and his or her parent will generally confer some incidental benefit to the child, the parent must prove the child will benefit to such a degree as to overcome the preference for adoption. (*Ibid.*) The beneficial parent-child relationship exception is not established simply by a showing of a parent's frequent and loving contact and relationship with their child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) Some of the factors the juvenile court should consider when determining whether the parent-child relationship is important and beneficial are: (1) the age of the child; (2) the portion of the child's life spent in the parent's custody; (3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs. (*Caden C.,* at p. 632; *Autumn H.,* at p. 576.)

On appeal, we apply a hybrid standard in reviewing a juvenile court's determination whether the beneficial parent-child relationship exception applies. (*Caden C., supra,* 11 Cal.5th at pp. 639–641; *In re J.C., supra,* 226 Cal.App.4th at pp. 530–531.) We apply the substantial evidence standard of review to the first two *Caden* C. prongs (regular contact and visitation and the existence of a beneficial parent-child relationship), and the abuse of

14

discretion standard to the third prong (whether there is a compelling reason for finding that termination of that relationship would be detrimental to the child). (*Caden C.*, at pp. 639–641; *In re J.C.*, at pp. 530–531.) Under the substantial evidence standard of review, we consider the evidence, and make all reasonable inferences therefrom, favorably to support the court's order and disregard contrary evidence as not accepted by the court as having sufficient veracity or persuasiveness. (*Caden C.*, at p. 640; *In re S.B.* (2008) 164 Cal.App.4th 289, 297–298 (*S.B.*).) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we cannot substitute our view for that of the juvenile court. (*Caden C.*, at p. 641; *Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)

B. *Analysis*

At the section 366.26 hearing, the juvenile court heard Mother's testimony and admitted in evidence the Agency's reports. The Agency's reports described A.B.'s visits with Mother and the social worker's opinions as to whether A.B. and Mother had a significant relationship and whether termination of that relationship would be detrimental to A.B. The court found that Mother had failed to carry her burden on all three prongs of the beneficial parent-child relationship exception. After finding that the beneficial parent-child relationship exception did not apply, the court terminated Mother's parental rights and selected a permanent plan of adoption for A.B.

Mother argues the court erred by finding the beneficial parent-child relationship exception did not apply to preclude the termination of her parental rights. First, she argues "the court never indicated just what the mother should have done, given the inability to have any contact with the

15

child due to Covid-19 regulations." The record, however, shows that even if Covid-19 visitation restrictions had been lifted, Mother still would not have been eligible for in person visitation due to her classification as a "high level" prisoner. The court did not find any evidence in the record that Mother tried to call A.B. or check on his "well[-]being" in any way. It then took Mother about a month to establish visitation with A.B. once she was released from custody. As the court noted, this is a "large amount of time" for a child so young. Specifically, the court explained:

> "The parent/child bond has three factors or elements that must be shown by the parent in order to establish the exception. One is regular visitation and contact. Two is a relationship, the continuation would benefit the child such that, three, the termination of parental rights would be detrimental to the child.
>
> "[¶] . . . [¶]
>
> "I will turn to the first element, which is regular visitation and contact. It's been described as pretty straightforward by the California Supreme Court. The question is whether the parent[] [has] visited consistently, taking into account the extent permitted by court orders. I will note that the question is regular visitation and contact. So even where visitation is not possible, a parent can meet this exception by maintaining contact. That is, reaching out telephonically to caregivers, perhaps, finding out and inquiring about the status of the minor.
>
> "I will note that between the birth of child for more than a year after that until August 28th, 2021, the minor was in the care of the caregiver, and the mother was in custody. During that period there was no visitation. I don't have any evidence before me that there was any attempts to contact the minor in any way during that period, even though I understand there were restrictions in the facility. There were COVID restrictions. There were ways to seek out information about the minor to check on his well[-]being.

16

"We will note that once the mother was released, a month went by, according to her own testimony, before she sought out visitation. A month in the life of a one-year-old is giant. That is a large amount of time. And the idea one would be released from custody and wait an entire month before reaching out to their child, it's hard to find regular visitation and contact under those circumstances.

"From that point on, we do have I believe something we could say is regular visitation. And it is within the parameters of the court order. The court ordered supervised visitation. The fact she did not ask for more or get more visitation, I don't believe that is something to hold against her.

"I think on balance, if you look at the entire period, the court could readily find that there is no regular visitation and contact under the first prong, and that is not met. However—and I will make that finding. I find that prong is not met."

Mother also argues that the "facts . . . support a finding that the child had a positive, beneficial relationship with her mother." The beneficial parent-child relationship, however, is not established any time a parent demonstrates frequent and loving contact or a friendly and loving relationship with their child. (*In re J.C., supra,* 226 Cal.App.4th at p. 529; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419.) The parent must demonstrate a significant emotional attachment between the child and the parent more than that of a "friendly visitor or friendly nonparent relative, such as an aunt." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318–319.) Here, evidence demonstrates Mother's relationship with A.B. was like a "family friend." As the court explained:

"But turning to the second prong—in an abundance of caution in case I am wrong about the first prong—whether

or not there is a relationship, the continuation of which would benefit the child. What do we have to look at for that?

"Well, the high court has instructed us we look at a few things. There's many factors that could be considered. Some of those factors are the age of the child, the portion of child's life spent in the parent's custody, the positive or negative effect of interaction between the parent and the child, and the child's particular needs.

"Now, of course, we look at how the child feels about, interacts with and looks to and talks about the parent. That is tough in a case where a child is so young.

"We also have to be mindful, though, that parent/child relationships don't always conform to a consistent pattern. So we are not looking at whether this relationship is necessarily parental in nature, given however one seeks to define that.

"The question is: is there a relationship here. A positive relationship. A substantial relationship.

"And given those factors, given the age of the child and the portion of the child's life spent out of the parent's custody and life entirely, it is more than half of [the child's life]. Not even two years old, and over a year of his life was spent outside of the mother's custody, but also outside of her visitation. Outside of any contact with her.

"Whatever relationship that does exist now, is a—I think this is clear if you read the reports—is a positive relationship, but it's not one much different than a child could experience with, as court case law has said, a friendly visitor. The child enjoys the visits. But it's not such that if the visits were to stop, that child would suffer harm.

"And so with that second factor, I want to be clear, I do not find that there is a beneficial relationship. And the court

has to look at not what might be a relationship in the future. It's what the relationship is right now.

"And so I understand that we might think, well, we need to maintain this relationship so that in the future it can grow. That is not the question. The question is today is there a relationship in existence that merits maintaining, that merits preservation."

Indeed, although A.B. enjoyed his weekly playtime with Mother, he had no emotional response to her affection, experienced no distress when visits with her ended, and was able to return to his routine easily. Our review of the record shows substantial evidence upon which the court could reasonably rely to conclude that there was not a significant emotional bond between Mother and A.B.

Finally, Mother complains that the court's finding that A.B. will not suffer detriment if his relationship with her is terminated was "conclusory." Assuming for the sake of argument that Mother established a beneficial relationship, we cannot find the court abused its discretion in ultimately concluding that the benefits A.B. would realize from adoption outweighed any harm or detriment he might suffer from the terminating Mother's parental rights. The court explained its reasoning:

"And I turn to the third element. Termination of that relationship would be detrimental to the child. So the court has to decide whether it would be harmful to the child to sever the relationship for adoption.

"[¶] . . . [¶]

"The court has to assume that terminating parental rights terminates their relationship. And so with that, the court has to decide whether the harm of severing the relationship outweighs the security and sense of belonging that a new family would confer. If severing the relationship would

19

deprive him to substantial positive emotional attachment, such that even considering the benefits of a new adoptive home termination would harm the child, the court should not terminate parental rights. That simply has not been shown.

"I do not have here a relationship with a parent that is so important to the child that the security and stability of a new home would not outweigh its loss. So I do not find that the third factor is also met, based on the evidence that was presented today."

Mother did not present any evidence that A.B. would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of this relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Instead, social worker Nguyen explained that A.B. was "at a critical stage of development where he is in need of permanency and stability, which can be provided to him through adoption by his current caregivers." Social worker Nguyen also opined that "adoption would be beneficial in providing him with a healthy upbringing and a sense of permanency. Through being adopted, [A.B.] can count on his needs being met without struggle, and having a sense of security, and belonging." We conclude that "[t]he court was entitled to find the social worker's opinion credible and give great weight to her assessment. We cannot reweigh the evidence or substitute our judgment for that of the [juvenile] court." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.)

" 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) On this record, the juvenile court did not exceed the limits of legal discretion in determining that providing A.B. this commitment outweighed the benefit he would gain through

maintaining his pleasant relationship with Mother.  (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)  Accordingly, we find no evidence of exceptional circumstances requiring application of the parental-benefit exception to the termination of Mother's parental rights.

## DISPOSITION

The orders denying the section 388 petition and terminating parental rights are affirmed.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.